CASE 70—CONTESTED LOCAL OPTION LAW—DEC. 9.

# Nall, Etc. v. Tinsley, Etc.

### APPEAL FROM OHIO CIRCUIT COURT.

107   441
121   444

107   441
f127   19

1. ELECTIONS—LOCAL OPTION—THIN BALLOTS.—All ballots should be printed on white paper so thick that the printing can not be distinguished from the back, and if ballots are used which do not substantially comply with the law the election is not conducted as required by law, and is invalid. The election in this case is held by a majority of the court not invalid on that account.

2. SAME—SUFFICIENCY OF PETITION FOR ELECTION—SECTION 2554.— Under section 2554, Kentucky Statutes, a petition for an election on the sale of liquor in Hartford does not require 25 per cent. of the voters of each precinct. Twenty-five per cent. of the voters of the city is sufficient.

3. SAME—RECITAL OF JURISDICTIONAL FACTS.—If it was necessary to recite in the order of the county court the facts necessary to confer jurisdiction to order a local option election, the proper time to make such recital was when the election was ordered.

R. P. NEAL, E. P. MILLER AND SWEENEY, ELLIS & SWEENEY FOR APPELLANTS.

1. The election in controversy was not held by secret ballot, and for that reason it is void. Ky. Con., sec. 147; Ky. Stats., sec. 1462.

2. County courts are courts of limited jurisdiction; they have no power or jurisdiction except such as is expressly conferred by statute. Con., sec. 141; Small v. Small, 2 Bush, 45; Fletcher v. Fugate, 3 J. J. Mar., 631; 9 Bush, 49; 79 Ky., 13; Chaudet v. Stone, 4 Bush, 210; Freeman v. Strong, 6 Dana, 283; Martin v. McKinney, Sneed, 321.

3. Judgments of courts of limited jurisdiction do not import absolute verity, but must recite facts conferring jurisdiction. 12 Am. & Eng. Ency. of Law, 983; Martin v. McKinney, Sneed, 321; Nischen, &c., v. Hawes, 15 Ky. Law Rep., 40; 4 Bush, 210.

4. The order of the Ohio County Court, on which the election in this case was ordered, is void, because it does not appear that the court ever acquired jurisdiction. No fact appears in the order or petition conferring jurisdiction; hence there was no authority in the county court to order the election. Com. v. Shelton,

Nall, &c., v. Tinsley, &c.

99 Ky., 123; Com. v. Green, 98 Ky., 22; Ky. Con., sec. 141; Small v. Small, 2 Bush, 18; Chaudet v. Stone, 4 Bush, 210.

5. The petition on which the order directing the election in this case was based does not state any fact authorizing the court to make the order, or any fact conferring jurisdiction. Com. v. Shelton, 99 Ky., 123; Com. v. Green, 98 Ky., 22; Nichen v. Hawes, 15 Ky. Law Rep., 40; Chaudet v. Stone, 4 Bush, 210; Ky. Stats., sec. 2554; Cole v. Com., 19 Ky. Law Rep., 324.

6. The order of the county court at its special August term, 1898, attempting to appoint election officers, was void. Ky. Stats., sec. 1447; Act of March 11, 1898, sec. 3.

7. The election in this case was void because it was not held by any officer authorized by law to hold it, nor was the election held at a place fixed by law. McCrary on Elections (4th ed.), secs. 153-176; Marshall v. Kerk, 2d Swan., 68; Foster v. Scarff, 15 Ohio St., 532; Walker v. Sanford, 78 Ga., 165.

8. Section 2559, Kentucky Statutes, is mandatory; its provisions were not complied with in this case, and because of this there was no power or authority in the county court to order the election in question and it ought to on this ground alone be set aside. 23 Am. & Eng. Ency. of Law, 411; Hoyte v. East Saginaw, 19 Mich., 39; Blake v. Sherman, 12 Minn., 420; Railroad Co. v. Warren County Court, 10 Bush, 712.

J. S. GLENN FOR APPELLEE.

1. The general demurrer to the notice of contest should be sustained because taken as a whole the notice states no cause of action or complaint, nor is there any single paragraph that sets out a legal cause of complaint.

2. The demurrer to the jurisdiction of the circuit court should be sustained, because under the amendment to the election law known as the Goebel Bill there is no appeal from the decision of the County Board of Contest.

3. The demurrer to notice and grounds of contest should be sustained because the notice does not set out facts showing that the contestants are or were at the time notice of contest was given legal voters and residents of the town of Hartford.

4. The demurrer to notice and grounds of contest should be sustained because they do not say that contestants had or have any cause of complaint.

5 There are no precincts in the town of Hartford, and hence the election had to be held at the two voting places in the town where all town elections had formerly been held.

6. It is not necessary that the order calling the election should show facts to make the election valid, even granting the facts complained of in notice are jurisdictional facts.

7. The officers who held this election were appointed both by the county judge and by the Board of Election Commissioners.
Citations:   10 Bush, 363; 84 Ky., 496; 20 S. W., 101; Ky. Stats., secs. 3669, 3670; see Am. & Eng. Ency. 5, p. 96 and notes; Cooley Const. Lim., pp. 63, 618; 80 Ky., 159; 96 Ky., 563; note page 103, Am. & Eng. Ency. of Law, vol. 5.

JUDGE PAYNTER DELIVERED THE OPINION OF THE COURT.

This appeal involves the validity of an election held in the town of Hartford under the "local option" law.  One of the grounds of contest is that the election is void because it was not conducted by secret official ballot but was openly conducted, it being claimed that the ballots used were not sufficiently thick to prevent them being distinguished from the back; that is, they were so thin that, when voted, it could be easily ascertained by looking at the back of ballot thus voted whether a voter had cast his vote for or against the proposition.  The questions to be considered on this ground of contest are:  (1) If the ballots used were of the character alleged, should they render invalid the election?  (2) Does the evidence sustain the claim of contestants that the ballots were so thin that it could be easily ascertained, by looking at the back of ballot voted, whether the voter had cast his vote for or against the proposition?

Before the adoption of the present Constitution, the *viva voce* system prevailed in this State.   In obedience to a popular demand for the reformed ballot system, commonly called the "Australian Ballot System," the makers of the Constitution inserted a provision therein to the effect that all elections by the people (with one exception) should be by "secret official ballot," and made it the imperative duty of the legislative department of the State to pass laws to enforce the provision of the Constitution.  The constitutional provision (section 147) reads as follows:  ". . .

All elections by the people shall be by *secret official ballot*, furnished by public authority to the voters at the polls, and marked by each voter in private at the polls, and then and there deposited. . . . The first general assembly held after the adoption of this Constitution shall pass all necessary laws to enforce this provision, and shall provide that persons illiterate, blind or in any way disabled, may have their ballots marked as herein required."

With the view of carrying out the constitutional demand, the General Assembly enacted chapter 41, Kentucky Statutes; and section 1462 provides that "*all ballots shall be printed on plain white paper, sufficiently thick that the printing can not be distinguished from the back.* . . ." This provision of the statute is applicable to the election, the question as to the validity of which we have under consideration.

That it was the purpose of the Constitutional Convention to require that elections be held by secret official ballot is perfectly manifest by the language employed. The Legislature so understood that to be the purpose of the makers of the Constitution. It provided that the ballots should be printed on paper sufficiently thick that the printing could not be distinguished from the back. The language employed excludes the idea that elections can be held in any other manner than that prescribed by the Constitution and General Assembly. The subject was regarded as one of great importance, or the makers of the organic law of the State would not have made such an imperative demand upon the General Assembly as was done. They were not content to leave it to the good judgment of subsequent Legislatures to shape the policy of the State with reference to this political matter. That the purpose in view was one worthy of the consideration of the best

talent in the State no one can doubt. Every freeman should be independent, and free from improper influences in the expression of his preference as to who should conduct the affairs of government, and as to the policies that should be adopted. If it is proper to obtain the assent of a freeman in such matters that assent should be the result of an honest judgment. He should be placed beyond reach of intimidation. The impression prevailed in the country that men and concerns employing large numbers of men used the great power which they possessed to control their employes in the exercise of an elective franchise. There was a fear that a system of bulldozing might be engaged in by such persons, which would result in the intimidation of honest employes, and thus force them to express the employer's judgment, and not their own Whether such a condition existed or not, it was thought wise by the makers of our Constitution to throw around all honest voters all the protection it was possible to give them, and the best method of doing so was believed to be the *secret official ballot.* Again, it was believed that bribery in elections could be checked. It was intended by the secret official ballot, to make the condition such that those who were disposed to corrupt the voters of the country could not tell for whom they had cast their ballots, thereby reducing the temptation to use money in elections for corrupt purposes.

In discussing the object of the Australian ballot system, Wigmore on the Australian Ballot System (2d Ed., p. 52), says: "On the one hand, it checks bribery, and all those corrupt practices which consist in voting according to a bargain or understanding. No man has ever placed his money corruptly without satisfying himself that the vote was cast according to the agreement;  .  .  .

and when there is to be no proof but the word of the bribe taker (who may have received thrice the sum to vote for the briber's opponent), it is idle to place any trust in such a use of money. In other words, take away all interest in committing an offense, and the offense will soon disappear. . . . On the other hand, the marking of the vote in seclusion reaches effectively another great class of evils, including violence and intimidation, improper influence, dictation by employers or organizations, the fear of ridicule and dislike, or of social or commercial injury,— all coercive influence of every sort depending on a knowledge of the voter's political action. Tumult and disorder at the polls, bargaining and trading of votes, and all questionable practices depending upon the knowledge gained, as the day goes on, of the drift of the contest,— it would hardly be necessary to argue in advance, even if England's experience did not prove it, that these practices, wherever they have prevailed, must disappear. In short, the secret ballot approaches these more or less elusive evils, not merely with the weak instrument of a penal clause for this and that offense, but with the effective methods of modern legislation. By compelling the dishonest man to mark his vote in secrecy, it renders it impossible for him to prove his dishonesty, and thus deprives him of the market for it. By compelling the honest man to vote in secrecy, it relieves him, not merely from the grosser forms of intimidation, but from more subtle and perhaps more pernicious coercion of every sort. By thus tending to eradicate corruption, and by giving effect to each man's innermost belief, it secures to the republic what at such a juncture is the thing vitally necessary to its health,—a free and honest expression of the convictions of every citizen."

It is clear that the purpose of the constitutional pro-
vision was to have a secret official ballot, so that corrup-
tion and intimidation in elections might be minimized, if
not absolutely prevented. The organic and statutory law
having been changed to put in force a new system of vot-
ing is conclusive evidence that it was intended to entirely
eliminate the old system, and that the new law creating
the new system must be construed as mandatory, if neces-
sary to accomplish its purposes. It certainly violates the
spirit and letter of the new law to so construe it as to
leave in force the old law in a modified form. To do so
destroys the essence of the substance of the new law.
In the judgment of the makers of the Constitution, an
election is not fair if the method employed exposes for
whom or for what the electors vote. To pursue such a
method is to disregard the spirit and language of the Con-
stitution and law, and render abortive the attempt to have
a secret official ballot and a fair election.

A rule for the interpretation of statutes is given
by Sutherland on Statutory Construction (section 459) as
follows: ".  .  . Where the whole aim and object of the
Legislature would be plainly defeated if the command to
do the thing in a particular manner did not imply a prohi-
bition to do it in any other manner, no doubt can be en-
tertained that the command is imperative.  .  .  ."

Endlich on the Interpretation of Statutes, in section 431,
says: "When a statute requires that something shall be
done, or done in a particular manner or form, without ex-
pressly declaring what shall be the consequence of noncom-
pliance, the question often arises, what intention is to be at-
tributed, by inference, to the Legislature?  Where, indeed,
the whole aim and object of the Legislature would be plain-
ly defeated if the command to do the thing in a particular

manner did not imply a prohibition to do it in any other, no doubt can be entertained as to the intention. . . ."

The Supreme Court of Nebraska, in State *ex rel* Waggoner v. Russell, 34 Neb., 118; [33 Am. St. R., 625; 51 N. W., 466], stated the rule for the interpretation of statutes relating to the conduct of elections as follows: "Since the first consider ation of the State is to give effect to the expressed will of the majority, it is directly interested in having each voter cast a ballot in accordance with the dictates of his individual judgment.

Recognizing the principle first stated, the courts have uniformly held that when the statute expressly or by fair implication declares any act to be essential to a valid election, or that an act shall be performed in *a given manner*, and *no other*, such provisions are mandatory and exclusive. By an application of the second principle, the courts, in order to give effect to the will of the majority, and to prevent the disfranchising of legal voters, have quite as uniformly held those provisions to be formal and directory merely which are not *essential to a fair election*, unless such provisions are declared to be essential by the statute itself."

We are aware that a majority of the courts of the country hold that mere irregularities on the part of election officers, or their omission to observe some merely directory provisions of the law, will not vitiate the poll, especially when the voters were in no wise responsible for the act or omission of the officer.

McCrary on Elections, section 225, says: ". . . But if, as in most cases, that statute simply provides that certain acts or things shall be done within a particular time or in a particular manner, and does not

declare that their performeance is essential to the valid-
ity of the election, then they will be regarded as manda-
tory if they do, and directory if they do not, affect the
actual merits of the election."

As the provision of the Constitution in question is, in
effect, a declaration that the old *viva voce* system fails to
produce fair elections, and that the new system is the
proper means to accomplish it, it necessarily follows that
the use of any except the *secret official ballots* affects the
merits of the election, inasmuch as it was not a fair elec-
tion, for that the law essentially requires.

A fair consideration of the provision of the Constitu-
tion and statute shows that it was intended that a com-
pliance with their provisions is essential to the validity
of the election.

Judge Cooley, in Hoyt v. East Saginaw, 19 Michigan, 39;
[2 Am. R., 76], says: "The courts, in their anxiety to sus-
tain the action of public officers, where irregularities have
occurred without the intervention of bad faith, have gone
to the very extreme in holding legislative enactments to
be merely directory, and have perhaps sometimes made
decisions which dispensed with those things which the
Legislature intended as essentials. The duty of the courts
is to examine the statute carefully, with a view to giving
the legislative intention effect; and they ought to sustain
defective proceedings only in those cases where it is fairly
inferable that they observe that intent more nearly by
sustaining them than by setting them aside on account
of the omitted formality."

It is not essential that the Constitution or statute should
declare that ballots in violation thereof should not be
counted, in order that they may be rejected, because the
object of the Legislature would be defeated if the kind

[ 29 ]

of ballot prescribed is not used, and the use of any other kind of ballot is, from the language used, impliedly prohibited. It is suggested that such an interpretation may disfranchise voters, and that they should not be so disfranchised by reason of the fraud or mistake of some county clerk whose duty, under the law, is to furnish the ballots. Whilst the voter may lose his vote by reason of such conduct of a county clerk, still that fact can not change the meaning of the Constitution and the statute; nor, to prevent such wrong in a given case can the courts afford to give such an interpretation to them as will destroy their purpose, and render possible the evils which were intended to be remedied.

Should a county clerk fail to furnish any kind of ballots for the use of the voters, and the regular officers of the election should open a poll and permit the electors to vote *viva voce* for the candidates of their choice, we certainly would hold that the election was invalid, because it was not in compliance with the law, but in disregard of it. The electors would not in any wise be responsible for the conduct of the clerk; still, their votes would not be counted.

Exactly the same condition exists when ballots are printed on paper so thin that it can be seen from the back for whom the electors cast their votes. The officers of the election could see for whom they voted, and it would be practically *viva voce* voting, and the evils intended to be remedied by a secret official ballot would still remain with us. Such an election would be invalid.

This court has been holding the constitutional and the statutory provisions made pursuant thereto mandatory.

In Banks v. Sergent, 20 Ky. L. R., 1027, [48 S. W., 151], it appeared that seventy-five persons had their ballots

marked on the table by some officer of the election, without
any disability being shown, or without swearing the voter;
that the voters appeared with a card upon which was writ-
ten the names of the parties for whom they desired to vote,
and one of the election officers would read it aloud, usual-
ly, and the clerk would mark the ballot, and it was then
deposited in the box. It was also shown that the booths
were placed near a window with the window lights out,
and large cracks in the log house; that, when the voter
went into the booth to vote, it could be seen by persons
outside how he marked his ballot. In passing upon the
question, the court said: "It seems to us that at precinct
No. 5 the officers of election wholly failed to hold the elec-
tion under the law. It was in no sense a secret ballot.
The secrecy of the ballot is the fundamental idea of all
elections, and this is required by the Constitution as well
as by the statute.

"This central idea being disregarded in this precinct,
and a practical *viva voce* election held, as the proof shows,
we are of the opinion that the returns therefrom should
be disregarded."

In Major v. Barker, 99 Ky., 308; [35 S. W., 544], it ap-
peared that some ballots were marked openly by the clerk
of the election without a statement under oath of disa-
bility required by section 1435, Kentucky Statutes. The
court said:

"In our view, the statute imperatively requires that
the voter shall declare his disability on oath before his
ballot can be marked for him by the clerk, and to permit
the officers to assume, either from the voter's appearance
or from their own alleged personal knowledge, that he is
so disabled as to be unable to mark his own ballot, would
be to open a door for wholesale evasion of the require-

ment of the secrecy in the ballot. This rule may result in hardship to the individual voter in cases where the officers are neglectful of their duty in requiring the oath of disability to be made, but the requirement that the voter shall take the oath before his ballot can be marked' and deposited in order that he may be punished if he make a false declaration is in our judgment mandatory to the voter."

We are of the opinion that all ballots should be printed on white paper, sufficiently thick that the printing can not be distinguished from the back, and if ballots are used at an election which do not substantially comply with the law, the election is not conducted as required by law, and is invalid.

Whilst a majority of the court concur in the views expressed as to the law, there is a difference of opinion on the question as to whether the testimony is sufficient to sustain the ground of contest we have expressed. A majority of the court being of the opinion that it is not sufficient, therefore we do not hold that the election was invalid for that reason.

Counsel for appellants contend that the petition asking that the election be ordered is defective because it does not purport to have been signed by a number of legal voters of each precinct or polling place in Hartford equal to twenty-five per cent. of the votes cast in each of the precincts at the last preceding *general election*.

Section 2554, Kentucky Statutes, provides:

"Upon application, by written petition, signed by a number of legal voters in each precinct of the territory to be affected, equal to twenty-five per cent. of the votes cast in each of said precincts at the last preceding general election, and when, for town or city elections, the num-

Nall, &c., v. Tinsley, &c.

ber of votes cast at the last city or town election, it shall be the duty of the judge of the county court in such county, at the next regular term thereof after receiving said petition, to make an order in his order book directing an election to be held in the said county, city, town, district or precinct, as the case may be, on some day named in said petition," etc.

A careful reading of the section shows that the first clause of it relates to legal voters in each precinct to be affected by the election. The territory referred to is a precinct or precincts which compose the political subdivision of a county. The second clause relates to city or town elections. When it is proposed to have an election in a city or town, the petition must be signed by a number of legal voters, equal to twenty-five per cent. of those cast *at the last city or town election.*

When the election is proposed to be held in a territory comprising precincts, the petition should be signed by a number of voters equal to twenty-five per cent. of the votes cast in each of the precincts *at the last preceding general election.*

Although there may be a number of voting places in a town or city, still it is not necessary that the petition should be signed by a certain per cent. of those living within a prescribed territory within the town or city, but it means a number equal to twenty-five per cent. of those who cast their votes at the last city or town election; so we think counsel is in error in saying that the petition is not sufficient.

It is contended that the county court is of inferior and limited jurisdiction, and therefore the order should state all facts essential to show that it had jurisdiction to order the election; that it should recite that there was a

Nall, &c., v. Tinsley, &c.

*written petition* filed, signed by a number of legal voters in each precinct of the territory to be affected, equal to twenty-five per cent. of the votes cast in each of the precincts at the last preceding general election.

Assuming for the argument that counsel is correct as to what the order should contain, still we do not think there was any substantial error in the proceedings, or that the order was defective in the particular mentioned. We have stated our conclusion that the petition should be signed by a number of legal voters, equal to twenty-five per cent. of the votes cast at the last town or city election. This being true, it follows that we do not agree with counsel that the petition should be signed by twenty-five per cent. of the legal voters of precincts, &c., as in the meaning of the statute under consideration precincts were not to be affected by the result, but the town.

There appeared in the order directing the election to be held language as follows, to-wit:

"It is adjudged by the court that the petition had been signed by twenty-five per cent. of the legal voters in each of the precincts to be affected by the proposed vote before the same was filed herein, and the court being advised, it is ordered that an election be held in the town of Hartford, Kentucky, county of Ohio, on the 3d of September, 1898, to take the sense of the legal voters, &c."

The county court assumed that there were two precincts in Hartford to be affected by the proposed vote, and therefore adjudged that the petition had been signed by twenty-five per cent. of the legal voters in each of the precincts, because the order recites the fact that twenty-five per cent. of the legal voters in each of the precincts to be affected by the proposed vote had signed the petition.

If this be true, more legal voters had signed the peti-

Nall, &c., v. Tinsley, &c.

tion than was required to sign it, because the record shows
that at the last election in Hartford, one hundred and fifty-
eight votes were cast, and forty-one legal voters appear
to have signed the petition asking for the election.

While the language of the order does not follow strictly
the statute, yet it recites that more voters signed the pe-
tition than was required by law. The criticism that the
order does not recite that a written petition was filed is
not proper, because the order recites that the *petition
had been signed, &c.* This, in effect, states that the appli-
cation was made by written petition.

We are of the opinion that if it was necessary to recite
in the order the facts to give the court jurisdiction, the
proper time to do so was when the order was entered di-
recting the election to be held.

There are other objections raised to the validity of the
election, but we do not think they are sufficient to war-
rant us in adjudging the election invalid.

The judgment is affirmed.

JUDGES DuRELLE AND BURNAM DISSENTING.   JUDGE GUFFY DE-
LIVERED SEPARATE OPINION.

DISSENTING OPINION BY JUDGE GUFFY.

I concur in the opinion so far as it affirms the judgment
herein. It seems to me unnecessary to now decide as to the
effect upon elections where the ballots used are not sub-
stantially such as are required by the statute.

I did not hear the argument in this case, and it has not
been quite convenient to me to examine the authorities
bearing on such an important question. I therefore de-
cline to either assent to or dissent from the opinion in so
far as it discusses or determines the effect of voting or
using ballots different from such as the statutes require.

Nall, &c., v. Tinsley, &c.

DISSENTING OPINION BY JUDGE DURELLE.

This is a proceeding to contest the validity of a local option election.

The opinion in the case undertakes to decide and settle a question of law entirely unnecessary to the decision of the case, for the facts upon which that question might have arisen are found not to exist. The question was argued only on behalf of the side in whose favor it has been decided. The decision of that question is stated in language so broad, not to say vague, that for that reason, if for no other, I should be unwilling to assent to it. But the principle set forth is so far-reaching, and so fraught with danger to the rights of the citizen, that I am compelled to express my dissent from it, though I concur in the decision of the questions which are necessary to decide the case before us.

The unnecessary part of the decision is briefly stated, that all the provisions of the statute necessary to the absolute secrecy of the ballot are mandatory for all purposes; that all ballots which do not conform, substantially, to the requirements of the statute, or are not in every respect secret, are invalid, without reference to the question whether the voter was at fault, or whether he had power to prevent the irregularity. This doctrine, carried to its logical conclusion, renders the constitutional guaranty of free elections a delusion, and the right of suffrage a mockery, for the right to vote is nothing if the vote when cast may be disregarded.

Election means choice. The holding of an election in this country, has always been considered to be the ascertainment of the will of the majority upon a given question. The supreme controlling idea in elections, in civilized countries, has always been the ascertainment of the choice of

the people. From time to time in the various States, by constitutional or legislative provisions, various modes have been devised for the ascertainment of that choice. At all times there have been provisions more or less stringent to prevent interference with the individual voter in the exercise of his right, and fraud in the ascertainment of the result.

Strict provisions have been enacted in regard to the mode in which poll-books should be kept, the distance from the place of voting which persons other than the voters were required to keep, and so on *ad infinitum*. Penalties, from time to time, have been imposed for violations of these provisions. To prevent fraud in the certification of the result, provisions of various kinds have been made, from time to time, for the signing of the poll-books. From time to time, all of these provisions have been disregarded by the officers of election, but the uniform rule of the courts all over this country has been that, where the failure in any of these respects did not prevent the choice of the people being made, or its result ascertained, the violated provision was to be regarded as directory to the voter, howsoever mandatory it might be as to the officer. So long as the election—that is, the choice of the people—was fair and free, and its result could be accurately ascertained, the freeman's right of suffrage was not interfered with, nor his choice frustrated.

Finally, in this State, as in other States, a constitutional provision was adopted that "all elections by the people shall be by secret official ballot, furnished by public authority to the voters at the polls, and marked by each voter in private at the polls, and then and there deposited." There was also a provision for assistance in the marking of the ballots of persons illiterate, blind, or in any way disabled.

This provision, and the election law adopted thereunder, were only a new mode adopted to secure the same object which had been aimed at in former laws. It was intended to enable the voter to freely express his choice, and to have his choice fairly recorded. The election was the purpose aimed at; the secrecy of the ballot was but a means to that end. As to the wisdom of such a provision there are different opinions. Some are entirely satisfied with the new mode; some prefer the ancient one. Unquestionably, with honest election officers, the new mode does in large measure prevent interference with the free exercise of the right of suffrage by intimidation, bribery or influence. With its wisdom we have nothing to do. It has been adopted by another branch of the Government. The important fact is, that in the very first of the Constitution it was provided that "All elections shall be free and equal," and that the provisions for secrecy in the ballot were merely the way specified by which that freedom and equality were to be obtained.

And so we find that the courts, almost without exception have adopted the general doctrine that, where irregularities have occurred in the means devised to secure free and fair elections, but nevertheless the elections were free and fair, such irregularities should be disregarded, so far as the voter was concerned, if he were not in fault, unless it were expressly provided that the election should be thereby invalidated.

Any number of authorities might be cited upon this point. The most recent case upon the subject is Lewis Jones v. State *ex rel* David Wilson (Ind. Sup.), [55 N. E., 229].

In that case, in an opinion by Hadley, J., delivered November 15, 1899, the statute required

the clerk to have printed on the ballot general directions how to vote. It also required the face of the ballot to show correct designations of the offices to be filled at the election. It also required the clerk of the poll to initial the ballot upon a certain designated part of it. There were no directions how to vote on the ballot. The office of trustee was designated "councilman," and the poll clerk put his initials on the wrong part of the ballot. There were several other inaccuracies.

Said the court:

"The ballots cast were those furnished the voters by the officers whose duty it was to prepare them in due and legal form, *and the absence of objection to the form of the ballot before it has been delivered to the voter, and until after the election has been held, carries the question beyond meritorious complaint.* . . . To hold that all prescribed duties of election officers are mandatory, in the sense that their nonperformance shall vitiate the election, *is to engraft upon the law the very powers for mischief it was intended to prevent.* If mistake or inadvertence of the officer shall be fatal to the election, his *intentional wrong* may so impress the ballot as to accomplish the defeat of a particular candidate or the disfranchisement of a party. And it is no answer to say that the offending officer may be punished by the criminal laws, for his punishment will not repair the injury done to those affected by his acts.

It is the duty of the courts to uphold the law by sustaining elections thereunder that have resulted in a full and fair expression of the public will, and from the current of authority the following may be stated as the approved rule: All provisions of the election law are mandatory if enforcement

is sought *before election*, in a direct proceeding for the purpose; but after election all should be held directory only, in support of the result, unless of a character to effect an obstruction to the free and intelligent casting of the vote, or to the ascertainment of the result, or unless the provisions affect an essential element of the election, or unless it is expressly declared *by the statute* that a particular act is essential to the validity of an election, or that its omission shall render it void.

Parvin v. Wimburg, 130 Ind., 561, [30 Am. St. R., 254, 30 N. E., 790]; Boyd v. Mills, 53 Kan., 608, [37 Pac., 16; 25 L. R. A., 486]; Miller v. Pennoyer, 23 Or., 364, [31 Pac., 830]; Stackpole v. Hallahan, 16 Mont., 40, [40 Pac., 80, 28 L. R. A., 502]; Blankinship v Israel, 132 Ill., 514, [24 N. E., 615]; Adsit v. Osman, 84 Mich., 426, [48 N. W., 31, 11 L. R. A., 534]; McCrary on Elections, sections 2228, 2229; Endlich Interp. St., section 433."

There is an apparent conflict with the rule here laid down in some cases from States which do not provide an *official* ballot, but the ballots to be voted are furnished by the governing bodies of the political parties interested in the result. In some of those cases it has been held that the printing of the ballot furnished by one political party with words which might mislead the voter into believing that he was voting the ticket of another party would invalidate the ballots. These cases clearly go upon the theory that the offending *political party* was practicing a fraud, and should be punished for it by depriving it of any potential benefit which might be derived from it.

But to apply the doctrine stated to throw out precincts, and change the result of elections, on account of irregularities in the form of the ballot, for which neither the

candidate nor the voter was responsible, seems to me mon-
strous. For example: There is an ebb and flow in po-
litical sentiment in nearly all the districts of this State.
Suppose a Republican county clerk to be elected in a dis-
trict usually overwhelmingly Democratic, and an election
to occur at which the election of the Democratic nominee
for Judge of this court is a foregone conclusion. The
clerk—accidentally, of course—has the ballots for the
heavy Democratic precincts printed on paper which is
somewhat too thin. The result of the doctrine contended
for is that those precincts are thrown out, and the others
counted. Wherein are the Democratic candidate and the
voters at fault? What could they do? They might mob
the clerk, but what good would that do?

The point is urged that secrecy in the ballot is, by
Constitution, made an essential element of the election.
That is true. But is it not of greater importance, is it
not more essential, that the election should be a real elec-
tion, than that it should be secret? Is it not more im-
portant that the will of the majority should have effect,
than that the election officers should be prevented from
making a more or less accurate guess at the contents of
folded ballots?

When a court of last resort undertakes to lay down
a doctrine, the logical application of which will enable
the fraud or negligence of an official to work the disfran-
chisement of the majority of the voters, there is an end
of free government. The sanctity of the freeman's will
is violated, out of oversensitive regard for the sanctity
of the mode of its expression. The right of election is
destroyed, out of respect to the manner of holding it. The
thing itself is sacrificed on the altar of a mere attribute.
For "election" means the ascertainment of the will of the

majority. That is *the* essential thing, and should never be forgotten.

When the people voted that the will of the majority should be expressed by secret ballot, they never contemplated the suggestion that the secrecy which was provided as a means to attain that end—the expression of the will of the majority—would or could be made the means of defeating it. Secrecy was undoubtedly intended to be an essential attribute of elections, but it was an attribute, and was not intended to work the defeat of the right of free elections. The provisions for that secrecy *are* mandatory. But how? Mandatory to the officer. Mandatory whenever they are sought to be made mandatory by any direct proceeding before the election. But not mandatory, after the election has been held and the ballots destroyed, to defeat the will of the voter, who is helpless to prevent the forbidden irregularity. It is not pretended in this case that the freedom or equality of this election was interfered with, as a result of the alleged thinness of the ballots, or that any objection was made to the form or structure of the official ballot until after the result of the election was known.

On election day the voter goes to the polling place. He is furnished with the official ballot. He votes it. By the defective construction of the ballot itself, it is not as secret as it should be. But that is not his fault. He must vote on that ballot, or not at all. He is absolutely helpless. Now, if he can be disfranchised, and the guilty person profit by his disfranchisement, the holding of an election is a fraud.

That the ascertainment of the voter's will was regarded as a matter of supreme importance by the legislative branch, as well as by the framers of the Constitution, is

shown by the specific requirement in 'section 1471, Kentucky Statutes, that "no ballot shall be rejected for any technical error which does not make it impossible to determine the voter's choice."

A technical error, therefore, *committed by the voter himself,* does not invalidate the ballot; but a technical error committed by the dishonest officer can now, under the opinion in this case, disfranchise him. Of what avail is it to secure to the voter or "to the Republic, what, at such a juncture, is the thing vitally necessary to its health, the free and honest expression of the convictions of every citizen," if the ballot by which those convictions are expressed may be thrown out at the will of a dishonest officer? And is the election *fair* if the will of the majority is reversed? Is this statute, which is designed to enable the voter to follow "the dictates of his individual judgment," to be made operative merely to afford him a harmless amusement?

Two Kentucky cases—Major v. Barker, [35 S. W., 543], and Banks v. Sergent, in 20th Reporter, [48 S. W., 149]—are relied on in the majority opinion. Those cases do not, nor does any case in the books, sustain the doctrine laid down in the majority opinion. In each of those cases there was a violation of the statute by the voter himself, and the provision was held mandatory *to him.* It was by his own fault that he lost his right. In the latter of the cases the facts proven in the record showed, also, that there was no election—no choice by the people.

I am not saying that this attribute of secrecy is not so essential that open and flagrant violations of it should not be held to require the whole election to be held over. But, in my judgment, it should never be so held so as to reverse the will of the

majority in a district, a county, or a state, by rejecting the ballots of one or more subdivisions thereof—the election being ·otherwise fair and free—for an irregularity for which the voters were not responsible, and which they were powerless to prevent.

I dissent from the opinion of the majority.

JUDGE BURNAM concurs.