Jefferson County ex rel. Grauman, Co. Atty., et al.
v. Jefferson County Fiscal Court et al.

(Decided May 24, 1938.)

LAWRENCE S. GRAUMAN and ROBERT L. SLOSS for appellants.

EDWIN C. WILLIS, HUBERT MEREDITH, Attorney General, and A. E. FUNK, Assistant Attorney General, for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Reversing.

The case presents the primary question whether the use of voting machines in popular elections may be authorized by the legislature without offending the Constitution of the state. Contingent secondary questions as to a particular enactment also are submitted, but it becomes unnecessary to answer them.

At its regular 1938 session, the General Assembly enacted Senate Bill No. 77, Acts 1938, c. 133, authorizing any county, through its fiscal court, or any municipality or other voting district through its legislative body, to purchase, rent or lease voting machines to be used in any or all elections. In general, it may be said that the Act seems sufficient to require and to secure the secrecy of the vote and to protect the count and canvass. The details as to the use of the machines, the facilities afforded and the manner of operation are not material here. The voter declares his choice by operating two or more levers of a machine which is far less complicated in its operation than in its structural mechanics. We may well take cognizance of the adoption of these machines as a method of registering the votes of the people and their seemingly satisfactory use in several other states.

The fiscal court of Jefferson County appropriated $1,000 for renting voting machines to be used in certain precincts at the November, 1938, general election. The County, on relation of the County Attorney, filed this suit challenging the constitutionality of the Act of the legislature, and asking a declaration of rights in certain particulars. The chancellor held the Act valid, and his judgment is before us for review.

It seems hardly necessary to say that the reasonableness, wisdom and propriety of an Act of the legislature is not for the courts to determine. That is a right vested in that body of magistracy, and there is neither power nor desire to usurp that right. However, unlike those governments possessing no written constitution, the power of the legislative departments of our national and state governments is not omnipotent. The nature and form of our government imposes limits upon it. The constitution itself is in every real sense the supreme law, the makers thereof being the people themselves in whom, under our political system, sovereignty primarily resides. Though the legislature of a state may exercise all governmental power not denied it and may enact any law not expressly forbidden by the state or the federal constitution, where such authority has been withheld the people have declared that any act transcending that restriction or opposing that supreme law shall be void. It long ago passed from the realm of argument that the judiciary not only has the authority but is charged with the duty of deter-

mining whether a legislative act does conflict with the constitution, and if it does, to declare it ineffective.

The courts are reluctant to exercise this power because of the appreciation that they constitute only one of the coordinate divisions of government and the consideration that is rightfully to be accorded the other. Therefore, it is a rule of uniform acceptation that every doubt and presumption will be resolved in favor of the constitutionality of an act of the legislature; or, as sometimes expressed, no act will be held unconstitutional unless it is clearly and manifestly so. Campbell v. Commonwealth, 229 Ky. 264, 17 S. W. (2d) 227, 63 A. L. R. 932; Commonwealth Life Insurance Co. v. City of Paducah, 244 Ky. 756, 52 S. W. (2d) 704; Martin v. J. Bacon & Sons, 268 Ky. 612, 105 S. W. (2d) 569. The courts will not give a technical interpretation, but will regard the language employed in the constitution as that ordinarily understood by the generality of the people, and will strive to give a construction of an act of the legislature that will make it harmonious with the provisions of the constitution as thus regarded. Crick v. Rash, 190 Ky. 820, 229 S. W. 63; Cammack v. Harris, 234 Ky. 846, 29 S. W. (2d) 567; State Board of Election Commissioners v. Coleman, 235 Ky. 24, 29 S. W. (2d) 619; Shannon v. Heringer, 271 Ky. 248, 111 S. W. (2d) 603. The constitution is understood to be enduring and comprehending. Accordingly, language competent to the then existing state of society and at the same time capable of being expanded to embrace more extensive relations will be so interpreted and held adaptable to the relations and conditions of the present state of society. Thus, it may be said that the constitution is organic not only in the sense of being the fundamental law, but as a living thing designed to meet the needs of a progressive society. Beyond defining the form of government and conserving the rights of the individual citizen, a constitution is primarily a declaration of principles. When its language is so confined it is generally responsive to changing conditions, developing needs, and advancing science. Fowler v. Obier, 224 Ky. 742, 7 S. W. (2d) 219; Potter v. Dark Tobacco Growers' Co-operative Association, 201 Ky. 441, 257 S. W. 33; Herold v. Talbott, 261 Ky. 634, 88 S. W. (2d) 303. But the constitution of Kentucky in many respects is unusually restrictive and characteristically legislative. And though, as has been frequently said,

a constitution is not static, if its adaptation to a given act of the legislature is destructive of its specific principles, or is clearly opposed to its particular requirements or restrictions, such accommodation cannot be recognized. Wood v. Commonwealth, 225 Ky. 294, 8 S. W. (2d) 428; Ludwig v. Johnson, 243 Ky. 533, 49 S. W. (2d) 347.

With this conception of our limitations and of our obligations, we approach the consideration of the constitutionality of the challenged act.

Section 147 of the Constitution of Kentucky declares:

"In all elections by persons in a representative capacity, the voting shall be viva voce and made a matter of record; but all elections by the people shall be by secret official ballot, furnished by public authority to the voters at the polls, and marked by each voter in private at the polls, and then and there deposited. The word 'elections' in this section includes the decision of questions submitted to the voters, as well as the choice of officers by them. The first general assembly held after the adoption of this Constitution shall pass all necessary laws to enforce this provision, and shall provide that persons illiterate, blind, or in any way disabled, may have their ballots marked as herein required."

Our previous constitution required that in all elections by the people "the votes shall be personally and publicly given viva voce: Provided, That dumb persons, entitled to suffrage, may vote by ballot." Article 8, Section 15, Constitution of 1850.

As stated by this court not long after the adoption of the present constitution, the change from the viva voce system to what was then commonly called the "Australian Ballot System" was in obedience to a popular demand, and the makers of the Constitution by inserting the provision that all elections by the people (with one exception) should be by "secret official ballot" made it the imperative duty of the legislature to pass laws to enforce that provision. Nall v. Tinsley, 107 Ky. 441, 54 S. W. 187, 21 Ky. Law Rep. 1167.

Strict construction of the word "ballot" finds no justification in etymology or in the expressed views of

legislatures or interpretations by the courts. Originally a ballot was a ball, grain of corn, bean or other small object concealed in the hand and cast or deposited in an urn or box so as not to disclose how it was voted—the origin of our familiar word "blackball." From that derivative was developed the paper ballot, which is the common or generally accepted meaning of the term, though some fraternal organizations adhere to the ancient mode. That was the connotation of the word when used in the Constitution of 1891, and unquestionably it was what the framers of that document meant and contemplated should be used. Certain it is that a mechanical method of voting such as is provided for in the Act under consideration was unknown to them. Nevertheless, as has been often stated in the opinions of the courts, the term "ballot" without a definitive adjective or other phrase has always been used to express the idea of a vote cast in such a way that its purport is unknown; that is, a secret ballot. Under the conception of elasticity of a constitution permitting its general or non-restrictive terms to cover the developments of the modern age, where it has merely provided that "all elections shall be by ballot," it has been construed to permit the legislature to authorize the use of voting machines. State ex rel. Automatic Registering Machine Co. v. Green, 121 Ohio St. 301, 168 N. E. 131, 66 A. L. R. 849 (overruling State ex rel. Karlinger v. Deputy State Supervisors, 80 Ohio St. 471, 89 N. E. 33, 24 L. R. A., N. S., 188); Norris v. Mayor and City Council of Baltimore, 172 Md. 667, 192 A. 531; Lynch v. Malley, 215 Ill. 574, 74 N. E. 723, 2 Ann. Cas. 837; Spickerman v. Goddard, 182 Ind. 523, 107 N. E. 2, L. R. A. 1915C, 513; U. S. Standard Voting Machine Co. v. Hobson, 132 Iowa, 38, 109 N. W. 458, 7 L. R. A., N. S., 512, 119 Am. St. Rep. 539, 10 Ann. Cas. 972; Detroit v. Inspectors of Election, 139 Mich. 548, 102 N. W. 1029, 69 L. R. A. 184, 111 Am. St. Rep. 430, 5 Ann. Cas. 861; Elwell v. Comstock, 99 Minn. 261, 109 N. W. 113, 698, 7 L. R. A., N. S., 621, 9 Ann. Cas. 270; State ex rel. Fenner v. Keating, 53 Mont. 371, 163 P. 1156. The New York Constitution, art. 2, sec. 5, provided that all elections by the citizens should be "by ballot, or by such other method as may be prescribed by law, providing that secrecy in voting be preserved." The Rhode Island Constitution, art. 8, sec. 2, after providing for voting by ballot, added the sentence, "And in all cases

where an election is made by ballot or paper vote, the manner of balloting shall be the same as is now required in voting for general officers, until otherwise prescribed by law.'' The Washington Constitution, art. 6, sec. 6, added, ''The legislature shall provide for such method of voting as will secure to every elector absolute secrecy in preparing and depositing his ballot.'' Thus those constitutions reflect the understanding that there may be methods of secret voting other than by the commonly accepted paper ballot, and thereby made a distinction. The courts of those states recognized the authority all but expressly granted to their respective legislatures to inaugurate voting machines. People ex rel. Deister v. Wintermute, 194 N. Y. 99, 86 N. E. 818; Re McTammany Voting Machine, 19 R. I. 729, 36 A. 716, 36 L. R. A. 547; State ex rel. Empire Voting Machine Co. v. Carroll, 78 Wash. 83, 183 P. 306.

The appellees, in contending for the validity of the Act under examination, rest their argument upon the proposition that the sole purpose of the Kentucky Constitution is to secure secrecy in the voting and, as the use of the machines unquestionably does that in a manner even more certain than the present system, the adoption of the method is within the power of the legislature. The rulings of the other courts above cited are relied upon in support. If the provision of our constitution were simply that elections should be by ballot there would be no hesitancy in yielding to the argument and concurring in the conclusion. We think, however, that because of the restrictive character of the language of the Constitution of Kentucky none of these cases can have the full force of authority as a legal precedent.

The meaning of a word or a phrase is not to be determined by the dictionary alone, for its context and association may often be controlling. Thus the requirements of the constitution of Massachusetts are that officers ''shall be chosen by written votes,'' part 2, c. 1, sec. 3, art. 3; that those commissioned to conduct the election shall ''sort and count the votes, and form a list of the persons voted for, with the number of votes for each person against his name,'' part 2, c. 2, sec. 1, art. 3, and ''make a fair record of the same,'' and a ''public declaration thereof,'' part 2, c. 2, sec. 1, art. 3. In an advisory opinion to the House of Representatives, three members of the Supreme Court of Massachusetts ex-

pressed the view that their constitution did not preclude the use of voting machines. One member of the court concurred in the result conditionally. Three judges expressed the opinion that the use of the machines was precluded. Opinion of the Justices, Re House Bill No. 1,291, 178 Mass. 605, 60 N. E. 129, 54 L. R. A. 430. When the question came before the court after the adoption of the mechanical system, the court held the act unconstitutional and the adoption invalid. It concluded that there was too great a departure from the method referred to in the Constitution to be included within its broadest meaning. Nichols v. Minton, 196 Mass. 410, 82 N. E. 50, 12 L. R. A., N. S., 280, 124 Am. St. Rep. 568. Since a "written vote" to be "sorted and counted" and a "marked ballot" to be "deposited" is essentially the same, we quote extensively from the Massachusetts case because of its application, namely (page 51):

"It may be argued that the making of a material record of this act by each voter, and thereby securing for it greater certainty and performance than would result from a show of hands, or a declaration viva voce, is accomplished by the use of the machine as well as by a paper vote written by the hand of the voter and deposited in a box. The secrecy of the ballot is even more effectively secured by the machine than by the method practiced 100 years ago. It might be contended that, when the voter has pressed down the key before the name of each of his candidates, he has before him his vote upon which his choice is designated by the crosses opposite the names, and that his movement of the lever which makes the record upon the dials below does not differ in effect from a movement of his hand in throwing a piece of paper into a box, and that the numerical adjustments and uncertainty that intervene between his act and the entry of the result by the election officers are no greater in the one case than in the other. Some of the Justices, including the writer of this opinion, would prefer to decide that this method of voting is within the meaning of the constitutional provision.

"But the method in detail is entirely unlike the writing of a name of chosen candidates upon a piece of paper, and the deposit of the paper in a box, to be afterwards taken out and counted. In

the use of the machine the voter must trust everything to the perfection of the mechanism. He cannot see whether it is working properly or not. This chance of error, whether greater or less than the chance that a ballot deposited in a box will not be properly counted, is very different from it. It was not within the knowledge or contemplation of the framers of the Constitution.

"In one of the opinions already referred to, signed by three of the justices (178 Mass. 616, 60 N. E. 133, 54 L. R. A. 430), this language was used: 'Interpreting the Constitution in the light of the circumstances existing at the time of its adoption, as well as of the laws and customs which had theretofore prevailed, we think that the language prescribing the way in which the will of the voters shall be expressed and ascertained in the case of the election of Governor and of the other state officers, where similar language is used, necessarily implies at least that the choice of the voter shall be indicated by some kind of writing upon a paper or other material thing, that this material thing bearing this written expression of the choice of the voters shall by this act of voting pass from his possession and control into that of the officers charged with the duty of conducting the election, and that the voter shall have reasonable opportunity to see that it has so passed, that it shall be distinct from that handed in by any other voter, and that these written votes so handed in shall continue to be the same material things, capable of being handled, sorted and counted, and that the whole work of ascertaining and declaring the result shall be the personal act of these election officers, with the written votes before them, the sorting and counting as well as the declaration of the result being done by sworn officers. One reason for the requirement of a written vote is that the voter may have a reasonable opportunity of making his choice without immediate influence upon the part of others; and that the reason for the requirements applicable to the sorting and counting is that the votes may not fail of their proper force by reason of mistake or fraud in the count. The safeguard erected by the Constitution is that there shall remain after the closing of the voting, in a material form, capable

of being read and understood by men, a written vote cast by each voter; and that all these individual votes, each given by the voter to the election officers, shall be read, sorted and counted in accordance with the several tenor of each, by men acting under the sanction and obligation of their respective official oaths.' ''

Let us turn again to Section 147 of the Constitution of Kentucky. It and its companion section 148, providing when and during what hours elections are to be held, are legislative in character. They go beyond general declarations and lay down a specific plan and particular method. They picture the Australian system. And as has been declared, those provisions as to the hours, prescribed in both the former and present constitutions, are mandatory and exclusive. Varney v. Justice, 86 Ky. 596, 6 S. W. 457, 9 Ky. Law Rep. 743; Banks v. Sergent, 104 Ky. 843, 48 S. W. 149, 20 Ky. Law Rep. 1024. As stated in Nall v. Tinsley, supra:

"The subject [of elections] was regarded as one of great importance, or the makers of the organic law of the state would not have made such an imperative demand upon the general assembly as was done. They were not content to leave it to the good judgment of subsequent legislatures to shape the policy of the state with reference to this political matter."

The issue in that case was the validity of an election in which it was claimed secrecy had not been preserved by the use of thin paper for the ballots, and the thought uppermost in the mind of the court in its discussion was the particular question of secrecy. That such was the primary purpose of the constitution has consistently been regarded. Gardner v. Ray, 154 Ky. 509, 157 S. W. 1147. But other like requirements cannot be ignored. They are that the ballot shall be "furnished by public authority at the polls and marked by each voter in private at the polls and then and there deposited." This obviously is as specific as the requirement merely of "written votes" contained in the Massachusetts constitution. We have heretofore recognized the mandatory character of the provisions of this section of the constitution other than that pertaining to the secrecy of the ballot. Thus in Clark v. Nash, 192 Ky. 594, 234 S. W. 1, 19 A. L. R. 304, a statute which permitted

the sending of ballots to voters who would be absent from the state on the day of election, to be marked at whatever place they might be and returned to the county clerk and by him delivered to the officers conducting the election and by them deposited in the ballot box, was held invalid. This was because the ballot was not and could not be furnished at the polls nor marked by the voter in private at the polls and then and there deposited in the ballot box. So far as the opinion discloses, the paramount objectives of secrecy and avoidance of the evils incident to public voting were obtained by the act. The conclusion that the statute had to yield to the constitution rests upon the conception that the court could not "give to this plain provision of our Constitution a strained, unnatural, or fanciful construction never intended by the framers or the people." Thus we recognized that the constitution's imperative requirements were not constricted to the element of secrecy in the vote but included that of personal presence in casting that vote. The act was held unconstitutional, therefore, not because of any violation of secrecy but because the voter must mark his ballot at the polls and not elsewhere.

Certainly, it cannot be said that the requirements that a ballot shall be "furnished" to the voter and shall be "marked" by him and "then and there deposited" may be ignored. "To preserve the instrument inviolate we must regard its words, except when expressly permissive, as mandatory, as breathing the spirit of command." Varney v. Justice, supra (page 459 of 6 S. W.). If we cannot ignore those provisions, then must it be declared that in furnishing the machine the public authority has furnished a ballot? Is it to be said that in operating the levers which mechanically and invisibly add the indication of the voter's choice to others of like mind that the voter has marked and deposited his ballot? The courts which have construed constitutional provisions that voting shall be by ballot have not undertaken to say that the machine is the ballot. They say merely that recording the choice is voting by ballot, that is, by a secret method.

Concerning the meaning of the language of the constitution of the United States, Chief Justice Marshall said, in Gibbons v. Ogden, 9 Wheat. 1, 188, 6 L. Ed. 23, that the framers of the constitution and the people who adopted it "must be understood to have em-

ployed words in their natural sense, and to have intended what they have said.'' That declaration is perhaps the genesis of that rule of constitutional construction so deeply imbedded in our judicature, and which is thus forcefully stated by Judge Thomas, writing for this court, in City of Lexington v. Thompson, 250 Ky. 96, 61 S. W. (2d) 1092, 1096:

> "It is hornbook law that in interpreting Constitutions the words employed therein should be given the meaning and significance that they possessed at the time they were employed, and the one that the delegates of the convention that framed the instrument, and the people who voted their approval of it, intended to express and impart.''

Therefore, in any case it must be very clear and certain that the people did not intend what the language they used in its natural sense and signification imports before a court should feel itself at liberty to depart from its plain reading, or in the exercise of the power to review acts of the legislature in respect of their constitutionality to permit the General Assembly to do so. Neither legislatures nor courts have the right to add to or take from the simple words and meaning of the constitution. The definition of the word "marked" is "having a mark; designated or distinguished by or as by a mark; hence emphasize; made clear; noticeable; conspicuous, as a marked card, a marked coin, a marked instance". Webster's New International Dictionary. The word "deposit" as a verb means "to commit to custody, or to lay down; to place; to put; to let fall (as sediment)". Webster's New International Dictionary. In view of the ordinary and generally understood meaning of these words, emphasized by their association one with the other and the context of the entire section of the constitution, we think it would be a very strained construction and application to say that operating a series of levers which blindly register the effect is marking a ballot and depositing it. Unquestionably the framers of the constitution meant that a paper ballot with the names of the candidates upon it should be furnished; that upon it the voter should mark or indicate his choice in a manner visible to himself; and that it should be exclusively controlled by himself until it was then and there placed or let fall by himself or an officer in his presence into some receptacle, and afterwards taken out and counted. Most assuredly,

686

this was the method in the mind of the makers of the constitution and the generation which adopted it.

Therefore, it seems to a majority of the court that the act designated as Senate Bill No. 77 cannot be held valid without doing violence to the plain meaning and intention of the constitution. Accordingly, it is adjudged to be unconstitutional.

Judgment reversed.

Whole court sitting, except Clay, J.

Rees and Baird, JJ., dissenting.