CITY OF LITTLE ROCK v. HENRY.

5-2370            345 S. W. 2d 12

Opinion delivered April 10, 1961.

[Rehearing denied May 1, 1961.]

*Joseph C. Kemp,* City Attorney and *Jack Young,* Asst. City Atty., for appellant.

*John T. Jernigan,* Prosecuting Atty., *Rodney Parham,* Chief Deputy Prosecuting Atty. and *John W. Barron, Jr.,* Deputy Prosecuting Atty., for appellee.

GEORGE ROSE SMITH, J. By Act 484 of 1949 the voters of each county were authorized to approve the use of voting machines in popular elections within the county. Ark. Stats. 1947, Title 3, Ch. 17. Section 1 of the act prohibits the use of any particular make of voting machine until it has first been approved by the State Board of Election Commissioners, and Section 2 enumerates eighteen specifications that a machine must meet to be eligible for approval.

In 1958 the electors of Pulaski county voted in favor of the installation of voting machines. Under Section 3 of Act 484 it then became the duty of the appellees, the county election commissioners, to arrange for the purchase of the machines, but the commissioners indicated by resolution that they did not intend to comply with the act. The appellants then brought this action for a declaratory judgment as to the validity of the act and for a writ of mandamus to compel the appellees to purchase and install the machines. The trial court found that the use of the machines would be contrary to Article 3, Section 3, of the state constitution. The appellants' complaint was accordingly dismissed.

The testimony in the case describes the Shoup voting machine, which has been approved by the state board and was found by the trial court to meet the specifications of Act 484. The Shoup machine is essentially a voting booth equipped with its operating

mechanism and with a movable curtain that affords privacy to the elector as he casts his vote.

In order for the Shoup machine to function the election officials must turn a control knob on the outside of the machine before each voter enters the booth. With each turn of the control knob the voter's number, beginning with number one and proceeding in numerical order, is shown upon a counter that is exposed to public view. It is contemplated that this number will be entered with the voter's name upon the lists kept by the election judges and clerks.

Upon entering the booth the voter closes the curtain by means of an electric switch. The names of the candidates and issues to be voted upon are set forth on a printed card similar to the written ballot that we have used in the past. The voter does not actually touch this printed list, which is behind glass or a transparent plastic. Instead, he makes his selections by moving the levers that are provided for each office and issue to be voted upon. When the voter has positioned the levers to indicate his choices he casts his vote by pulling a master lever, which registers the vote and clears the panel for the next elector. The voter then opens the curtain and leaves the booth. No additional vote can be cast upon the machine until the election officials turn the control knob mentioned earlier, which releases the operating mechanism for the next voter.

The Shoup machine, in common with other voting machines now on the market, does not make a separate record of the vote cast by each elector. Instead, the machine contains only a number of hidden adding machines which keep a running total of the votes for the various candidates and upon the various issues. These running totals are ingeniously protected against inspection by anyone at all until the polls have closed. At that time the election officials can open the machine and expose the total vote upon every office and issue that appeared on the printed card, or ballot. The machine has many other features, such as a provision for write-in

voting, that are not especially pertinent to the issues in this case.

The question is whether an election conducted by using the Shoup machine would conform to Article 3, Section 3, of our constitution: "All elections by the people shall be by ballot. Every ballot shall be numbered in the order in which it shall be received, and the number recorded by the election officers on the list of voters opposite the name of the elector who presents the ballot. The election officers shall be sworn or affirmed not to disclose how any elector shall have voted, unless required to do so as witnesses in a judicial proceeding, or a proceeding to contest an election."

The appellants rely upon a number of cases which have upheld the constitutionality of statutes authorizing the use of voting machines, but none of the cases deal with a constitutional provision like ours. Most of the decisions merely hold that voting machines are permissible when the constitution simply declares that all elections shall be by ballot. *Lynch* v. *Malley,* 215 Ill. 574, 74 N. E. 723; *Norris* v. *Baltimore,* 172 Md. 667, 192 Atl. 531; *State* v. *Green,* 121 Ohio St. 301, 168 N. E. 131; *Mooney* v. *Phillips,* 173 Tenn. 398, 118 S. W. 2d 224. In Texas the constitution also directed that the legislature provide for "the numbering of tickets," and the court held that this provision was complied with when it was shown, as it is here, that the voting machine assigned a number to each elector. *Wood* v. *State,* 133 Tex. 110, 126 S. W. 2d 4, 121 A. L. R. 931.

The machines were disapproved in Massachusetts, however, because the constitution required an election "by written votes." *Nichols* v. *Board of Election Commrs.,* 196 Mass. 410, 82 N. E. 50, 12 LRANS 280, 124 A.S.R. 568. The same result was reached in Kentucky, where the constitution provided that "all elections by the people shall be by secret official ballot, furnished by public authority to the voters at the polls, and marked by each voter in private at the polls, and then and there deposited." *Jefferson County* v. *Jeffer-*

*son County Fiscal Court,* 273 Ky. 674, 117 S. W. 2d 918. The court held that voting machines did not satisfy the specific directions that the ballots be furnished, marked, and deposited.

After studying the question we are unanimously of the opinion that an election conducted with the Shoup machine would not conform to the detailed requirements of our constitution. The controlling section requires that every ballot be numbered and that the number be recorded opposite the elector's name on the list of voters. It is also mandatory that the election officers be sworn not to disclose how any elector voted unless they are required to do so in an election contest or other judicial proceeding. We are unable to reconcile the use of the Shoup machine with these basic constitutional commands.

It is perfectly clear that the draftsmen of the constitution did not consider the numbering of the ballots to be a mere gesture having no practical significance. To the contrary, the matter was deemed so important that it was written into the constitution as a fundamental requirement in every election, not to be dispensed with by the legislature or by the courts.

When Section 3 of Article 3 is studied as a whole the reason for the mandatory numbering of the ballots cannot be open to doubt. If the number of each ballot is recorded alongside the voter's name it becomes possible in an election contest to open the ballot box and determine how each person voted. Thus if an election should apparently be decided by a margin of ten votes and it is shown that twenty ineligible persons voted, the numbering of the ballots enables the courts to declare the winner with certainty. Obviously this clause in the constitution is an effective precaution against fraud and a valuable safeguard to the purity of elections.

The appellants argue that the Shoup machine numbers the ballots when it assigns a number to each voter as he enters the polling booth. The trouble is

that this numbering has no practical significance, in the absence of any method for determining later on how a particular person cast his vote. It is really the voter who is numbered, and even that number is meaningless. All the Shoup machine number shows is the chronological order in which the electors cast their votes, but that information is without practical value and could just as well be obtained from an unnumbered list of voters. The point is that in an election contest the machine numbers would be useless in the absence of some method for determining conclusively how each ineligible person cast his vote. The basic purpose of the constitution is defeated by the machine's inability to make a record of each individual vote.

In holding that the Shoup machine does not satisfy the minimum requirements for an election under our constitution we do not, of course, express any opinion as to the desirability of such machines. That is not our concern, for we must give effect to the language of the constitution as it is written. It cannot be doubted that the secrecy of the ballot is better protected by the voting machine than by our traditional method of balloting, since the use of the machine prevents anyone else from ever discovering how an elector voted. But this circumstance is offset by the fact that the draftsmen of the constitution, with the knowledge available to them in 1874, chose to subordinate the secrecy of the ballot to the purity of the election.

The trial court declared Act 484 to be unconstitutional, but we think the declaration should be only that the use of the Shoup machine in its present form is contrary to the constitution. The machine's defect is that it does not make a record of individual votes. Act 484 is silent upon that point, however, and consequently the act cannot be said to violate the constitution. We perceive no constitutional objection to a machine conforming to the specifications of Act 484 and having the additional characteristic that is lacking in the Shoup machine.

With the indicated modification the judgment is affirmed.

McFADDIN and ROBINSON, JJ., concur.