# Glenn v. Gnau.

(Decided Oct. 25, 1933.)

DODD & DODD for appellant.

EUGENE R. ATTKISSON for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The parties to this contest proceeding filed in the Jefferson circuit court by appellee and contestant below, Ferd A. Gnau, against appellant and contestee, Charles E. Glenn, were rival candidates for the Democratic nomination in the recent August primary election for the office of representative in the lower house of the General Assembly from the Fifty-Second legislative district, comprising a part of the city of Louisville, Ky. The board of canvassers found that the contestee, Glenn, received in that election 951 votes, and that the contestant, Gnau, received 949 votes, and it so certified and issued a certificate of nomination to contestee. Within the prescribed time contestant filed this contest action against contestee and in his petition he alleged that in the Third precinct of the First ward of the city, composing a part of the Fifty-Second legislative district, the officers who held the election through mistake, or fraud and collusion, permitted a large number of voters to stamp their ballots openly on the table without complying with the law permitting such method of voting, and that at least thirteen of them, who were named, were cast for contestee, and, being illegal for the reasons stated, they should be deducted from his total certification of 951 votes, thus reducing his total to 939 legal votes as having been cast for him, and thereby nominating contestant by a majority of ten votes.

The answer denied the material averments of the petition, and in a separate paragraph counter grounds of contest were averred, and which challenged one illegal vote cast for contestant in the same precinct, and further alleged that in the Fifth precinct of the same ward there were cast 8 votes for contestant (naming them), each of which was illegal because the voter was not a member of the Democratic Party, and that he received in the same precinct 33 other illegal votes, because those who cast them were not registered as

Democrats at the last preceding general election in 1932, and which section 1550-19 disqualified them from voting. Following pleadings made the issues and upon submission, after proof taken, the court adjudged that contestant had received a majority of the legal votes cast in the primary election and was entitled to his certificate of nomination which was directed to be issued to him. Complaining of that judgment, contestee prosecutes this appeal.

Before addressing ourselves to the merits of the case we deem it proper to indulge in some observations on the conduct of the election officers in precinct 3 of the First ward throughout the day for holding the election, and which was: That, as expressly shown and admitted in the record, they agreed among themselves upon the opening of the polls that all voters who so desired might openly mark their ballots on the table without the administration of an oath, or compliance with any other statutory provision, whereby such method of voting was permitted. Such conduct of election officers cannot be too strongly condemned. It involves, not only an agreement and consent to set aside and annul wholesome and healthy, as well as mandatory, provisions of our election laws, but likewise involves a violation of the oath of the officers, which they are required to take before entering upon the discharge of their duties, the substance of which is, that they will conduct the election fairly and in accordance with the provisions of law, and which necessarily embraces the prescribed method by which a voter may so openly stamp his ballot. Therefore, an agreement and consent that such requirements shall not be observed is an open violation of the oath that the election officer takes. If the officers of election could legally so dispense with a mandatory requirement relating to the conduct of elections, they could with equal propriety dispense with all of them, including the one that the vote shall be by secret ballot, or even by ballot at all, and thus conduct the election after the vive voce plan. Boards of county election commissioners who appoint election officers should see to it that they are of such a type of citizenship as will not thus so lightly regard their oaths, but those whose only desire is to perform their official duties in accordance with the mandates of the law, and it is to be hoped that these observations will be here-

after recognized and scrupulously observed throughout the state.

Preliminary to a determination of the merits of the case, we deem it proper to state that this court at present is crowded with primary election contest cases, each of which must be determined in time to allow the official ballots for the general election to be printed and distributed, and for that reason, as well as for the additional one, that to do otherwise would be of no material service to the public, we have concluded to state our conclusion of fact, as arrived at from the evidence, without going into detail, and without discussing the testimony of each witness upon the issue, and to dispose of the case by giving our ultimate conclusions from all the testimony bearing thereon.

The court found that nine of the thirteen questioned votes by contestant in the Third precinct of the First ward were cast for contestee, and that each of them was marked on the table without the voters taking the prescribed oath showing the necessity for his doing so in that manner, and for which reason they were correctly found to be illegal and they were deducted from contestee's total vote, which reduced it to 942. For the same reason the court deducted from the total certification of contestant the single attacked illegal vote cast at that precinct by contestee in his counter pleading, and which reduced the contestant's total to 948. Under the court's interpretation of the law and his finding of fact relating to the votes contested by appellant in the Fifth precinct of the First ward, the majority so found for contestant was not eliminated, and for which reason the judgment was rendered in his favor. We thoroughly coincide with the conclusions of the court in his finding as a fact that 9 of the attacked votes in the third precinct of the First ward were illegal and were cast for contestee, and we also coincide with the finding that 1 vote in that precinct was for the same reason improperly cast for contestant; but we are also of the conclusion that at least 2 other votes of the attacked 13 in that precinct by contestant were each illegal for the same reason and were cast for contestee, the names of the voters casting them being Al Smith and Joe Christ, and which makes a net gain of the total number certified for contestant of 10 votes in the involved precinct, instead of 8 as adjudged by the court.

Before determining the matters involved in the counter contest, relating to the alleged 43 illegal votes cast in precinct 5 of the First ward of the city for contestant, it becomes necessary to settle a disputed legal question relating to the qualification of primary election voters in Louisville, wherein chapter 48, page 114, of the Session Acts of 1930 (now sections 1486b-28 to and including section 1486b-61 of the current Baldwin's Supplement to our present Statutes), applies. It is a registration statute applicable only to cities of the first class and is designated in its first section as ''The Model Registration Act for Cities of the First Class.'' At the time of the enactment of that statute, qualifications of voters in party primary elections were prescribed by section 1550-19 of the 1930 edition of our present Statutes. The party qualifications prescribed by that section are applicable to two classes of voters, (a) those where registration is not required, and (b) those where it is required, and as to the latter the Statute says: ''In precincts where registration is required, no elector, except those entitled to be specially registered as herein provided, shall be entitled to vote in any primary, unless he is registered in the registration book of said precinct for the preceding year, as affiliating with the party whose ballot he offers to vote,'' etc.

It will be noted that under that language no voter may participate in a primary election ''unless he is registered in the registration book of said precinct for the preceding year, as affiliating with the party whose ballot he offers to vote,'' unless he was entitled to be and was registered at some special registration following the general one, and for both of which our registration statute at that time provided, and which is still the governing statute in all registration territories in the commonwealth, except cities of the first class, which includes Louisville. The qualification statute supra (section 1550-19), for voters in party primary elections, is no part of any registration statute, nor does the Model Registration Act for cities of the first class, supra, purport anywhere in it to expressly modify, repeal, or otherwise alter such qualifications, it being purely a registration statute for cities of the first class. However, its section 1486b-29, as contained in the Supplement, supra, says, inter alia: ''That only persons

who are duly and properly registered as herein provided shall be permitted to vote at the general election to be held in 1930 and at all primary, general and special elections held thereafter.'' Other provisions prescribe that the registration board therein provided for shall be open for registration of voters throughout the year, except for fifty-nine days preceding the general election and five days thereafter, and in another section (1486b-33 of the Supplement, supra) it is provided that certain registrants becoming such within fourteen days preceding a primary election shall not be eligible to participate therein, the language being: ''That while it shall be the duty of the Board to register any person legally qualified to register but who has theretofore failed to do so, and to change the registration of any person who desires to change his registration, during the period commencing on the fourteenth day preceding the August primary election in the year 1931, and each year thereafter and lasting through the day on which said primary election is held, the person so registering, or changing his registration, shall not be entitled to participate or vote at the primary election in said year,'' etc.

The excerpt clearly means and refers to registrants who have not theretofore registered in the precinct, and also embraces those who may have been registered in another precinct but who removed to the one in which they seek such registration, and who seek to change their registration from the one precinct to another. In view of the purposes sought to be accomplished by the act, we do not feel authorized to construe it, in the absence of express terms so indicating, as permitting any formerly registered voter in the same precinct to change his party affiliations following the last general election and before the beginning of the fourteen-day period, supra, and thereby become qualified to vote in the primary election of the party to which he changed, in the absence of something else in that statute clearly so prescribing.

The general registration statute in this commonwealth, and which prevailed in all cities therein prior to the enactment of the 1930 act (and which now prevails in all cities except those of the first class), prescribes for specific dates for general annual registration of voters and also designates certain other dates and

periods for special registrations, following the general ones. Unless a voter on the general election day was registered, either at a general election, or a special one, he could not vote in that general election, and section 1550-19, supra, adopted as a party qualification to vote in party primary elections the political affiliation which the voter had declared and as it existed at the last general election, except as to those who were entitled to register at some later and intervening special registration within the period intervening between the last general election and the primary. But a voter once registered in the manner indicated remains so until he ceases to be a citizen of the precinct.

Under that registration statute (and which we have seen is now the law except as to cities of the first class) no registrant could change his party affiliation between a general election and the following primary one; but under the Model Registration Act (section 1486b-47 of the Supplement, supra) it is expressly provided that: "Any voter may at any time apply to the Board, in person or by letter signed by the voter, to have his registration or party affiliation changed." It is the contention of counsel for contestee that the Model Registration Act, by omitting the words "except those entitled to be specifically registered as herein provided," in prescribing the qualifications for voters in primary elections, repealed by implication the requirement in section 1550-19 that a voter in a primary election must be registered in the precinct at the last general election "as affiliating with the party whose ballot he offers to vote." The clear and undoubted purpose of the enactment of the Model Registration Act was to purify elections and to secure fairness in both primary and general ones, and in its section 32, now section 1486b-58 of the Supplement, supra, it is expressly enjoined that: "This Act and each of its various sections, paragraphs, clauses, and sections, shall be liberally construed in favor of the purposes of the Act."

If a voter changes his party affiliations by reregistering following a general election and before the succeeding one, and thereby qualifies himself to vote in that primary, it would open the door to the grossest frauds and most extensive abuses, resulting in making it possible for a sufficient number of the members of one party to participate in the primary election of the

opposing party and to dictate its nominees to be voted for at the following general election, and which result it cannot be contemplated the Legislature intended. Repeals by implication are not favored, and in view of that rule, supplemented by the admonishment contained in the express terms of the Model Registration Act, as viewed in the light of the purpose for which it was enacted, we decline to adopt such interpretation. On the contrary, we hold that, where a voter in a precinct within a first-class city was registered at the last preceding general election, that registration, as it then stood, is the governing one as to his party affiliations; and fixes his right to participate in the next following primary election.

However, registrants for the first time in the precinct who become such after a general election occupy the same status as those who were registered at some special registration preceding the primary election under the law as it existed prior to the passage of the Model Registration Act, and they are entitled to participation in the party primary election, but only in accordance with the first registration of the voter following the last general election. To illustrate, if A registers for the first time in a precinct in December following the general election as a Democrat (or Republican), his declaration of his party affiliation and that registration, being his initial one, is the governing one affecting his party affiliations so as to qualify him to vote in the following primary election, and it may not be altered or changed by him under the Model Registration Act so as to qualify him to vote in such primary election for candidates for an opposite or different political faith. There is nothing contained in the statute militating against the interpretations we have made, and they are most clearly required in order to carry out the purposes of its enactment. We therefore conclude that the trial court was in error in its interpretation of the Model Registration Act in the respects indicated; and which brings us to a consideration of the facts relating to the counter contested votes in precinct 5 of ward 1. But before doing so, what appears to be a mistaken impression of appellant's counsel should be corrected. They contend that the proof shows that 42 illegal votes were cast in the Fifth precinct of the First ward (but in which they are in part mistaken) which

should be deducted from the total number of votes cast in the legislative primary, and they distribute them by cancelling all of the 16 votes received by their client in that precinct, leaving 26 others to be deducted from the 97 votes received by appellee in that precinct; and in that manner counsel conclude that appellant received a majority of the votes in the entire legislative district. The error of counsel is that their method is not the one heretofore adopted by us in disposing of illegally cast votes, and especially as applicable to primary elections.

The same error also prevents the throwing out of the precinct in contest and counting none of the votes cast in the legislative race, even if such a course applies to a primary. On the contrary the rule relating to the disposition of illegal votes is to deduct them from the one who received them in all cases where the proof shows the one for whom they were cast, or where it was possible to have proven such fact. See Duff v. Crawford, 124 Ky. 73, 97 S. W. 1124, 30 Ky. Law Rep. 323; Skain v. Milward, 138 Ky. 200, 127 S. W. 773; Napier v. Cornett, 68 S. W. 1076, 24 Ky. Law Rep. 576; Combs v. Combs, 97 S. W. 1127, 30 Ky. Law Rep. 161; Caudill v. Stidham, 246 Ky. 174, 54 S. W. (2d) 654; Land v. Land, 244 Ky. 126, 50 S. W. (2d) 518; and Watts v. Bowen, 250 Ky. 678, — S. W. (2d) — . If the election is a general one, and there is no means by which to prove how the vote was cast, except by the voter himself, and he declines to testify as he has the right to do, then there would exist no means whereby such an illegal vote or votes were cast. However, the rule of exemption of the voter from testifying as to how he cast his vote has no application to an illegal voter, since it may be claimed by a legal one only, and his protection grows out of the fact of his constitutional guaranty of secrecy of his ballot; but such constitutional provision (section 147 of the Constitution) has no application to a primary election, and a voter therein may be required to testify as to how he cast his vote, even though he be a legal voter. See Hager v. Robinson, 154 Ky. 489, 157 S. W. 1138; Farleigh v. Reedy, 165 Ky. 782, 178 S. W. 1077; Black v. Spillman, 185 Ky. 201, 215 S. W. 28; Charles v. Flanary, 192 Ky. 511, 233 S. W. 904, and many others cited in those opinions.

Therefore, conceding that all of the votes attacked

by appellant in the Fifth precinct of the First ward by his counter contest were shown to be illegal (but which is untrue), then, before he could insist upon or require any of them to be deducted from contestant's total vote, it should be made to appear that they were cast for contestants, and which fact, we repeat, may and can be established by summoning the voter and requiring him to state the person for whom he voted. Some of the alleged illegal voters so attacked in the involved precinct testified at the trial, and more of them were shown to have been cast for contestee than for contestant, and under the rule as announced in the case of Drennan v. Roberts, 234 Ky. 575, 28 S. W. (2d) 735, contestant was and is entitled to have them deducted from the certified vote for contestee. The alterations in the total certifications made necessary by the rules and interpretations, supra, as to the illegal votes cast in precinct 5, ward 1, of the city of Louisville, are of minor importance, since it slightly increases the total vote received by contestant, but in no wise impairs the net increase in his vote (as we have hereinbefore determined), with reference to precinct 3 of ward 1, the irregularities in which formed the basis of his contest.

We therefore conclude that the facts as established by the testimony, when applied to the declared principles of law, sustain the judgment of the court, although it was arrived at through a different process of reasoning and upon a different interpretation of the governing statutes. In such circumstances it is the duty of this court to affirm the judgment, though based upon a different reason influencing the trial one. See Anderson v. City of Ludlow, 250 Ky. 204, 62 S. W. (2d) 785.

For the reasons stated the judgment is affirmed, the whole court sitting.