John B. **ANDERSON, Joseph C. Graves, Jr., and Gerald M. Eisenstate, Plaintiffs-Appellees,**

**Percy L. Greaves, Wesley Krogdahl, Margaret Krogdahl, Robert Vessels, Plaintiffs-Appellees, Cross-Appellants,**

v.

**Frances Jones MILLS, Secretary of State, Commonwealth of Kentucky, and Chairman State Board of Elections; State Board of Elections; and Members, Earl R. Searcy and Raymond F. Bossmeyer; Brady A. Miracle, Executive Director, State Board of Elections, Defendants-Appellants, Cross-Appellees.**

**Nos. 80–5318, 80–5328.**

United States Court of Appeals, Sixth Circuit.

Argued April 16, 1981.

Decided Nov. 20, 1981.

---

Steven L. Beshear, Atty. Gen. of Kentucky, Patrick B. Kimberlin, Asst. Atty. Gen., Frankfort, Ky., C. Thomas Anderson, Legal Counsel, State Bd. of Elections, Frankfort, Ky., for defendants-appellants, cross-appellees.

Samuel Manly, Alan E. Sears, Louisville, Ky., David Boyd, Ellen M. Semonoff, Washington, D. C., C. William Swinford, Jr., Lexington, Ky., Donald L. Gulick, Louisville, Ky., for plaintiffs-appellees, cross-appellants.

Before KEITH, Circuit Judge, JONES, Circuit Judge and ENSLEN *, District Judge.

ENSLEN, District Judge.

This is an appeal of two consolidated cases challenging the District Court's interpretation of several Kentucky election statutes. The first case originally concerned John Anderson's attempt to have his name placed on the ballot for the presidential election in 1980 as an independent candidate. The District Court determined that a statute (KRS 118.365) required the filing of the petitions for the presidency fifty-five (55) days before the general election, and, inasmuch as Anderson's petitions were filed before that time his name should have appeared on the presidential ballot in Kentucky. The lower court also decided that the Kentucky "sore loser" statute (KRS 118.345) is inapplicable to presidential candidates. Various Kentucky officials, including Secretary of State Mills, (hereinafter Mills is utilized for clarity to refer to all of these parties) challenged those findings while Anderson and other parties (hereinafter Anderson as to all of these parties) seek affirmation of them, 497 F.Supp. 283.

The companion case involves Percy L. Greaves' attempt to have his name placed on the presidential ballot. His supporters presented to the Secretary of State petitions containing 1,086 signatures, but the Secretary of State refused to place his name on the ballot alleging that the state statute (KRS 118.315(2)) required 5,000 petition signatures.[1] The District Court, agreeing with the Secretary's interpretation that the statute required 5,000 signatures, found the number of signatures requirement constitutional, and also ruled that the "desire to vote" provision was not constitutionally defective. Greaves and other parties (hereinafter Greaves) challenge these findings and join Anderson in arguing that the District Court's interpretation of the other statutes is correct.

**Abstention**

Although the parties have not raised any question concerning the propriety of the district court deciding this case, it is an issue which may not be ignored. It has long been the practice of federal courts, even when jurisdiction has been properly invoked, to stay an action based on questions of state law, until a state court has had the opportunity to pass on the issues. *Railroad Commission of Texas v. Pullman Company*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). This approach is favored because it minimizes the chances of conflict between the state and federal systems, as well as lessens the possibility that federal constitutional issues will be unnecessarily decided. *Pullman, supra; Siler v. Louisville and NRR*, 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909).

On its face, the case before the Court is a prototype of the cause of action to which the abstention doctrine is applicable. It involves state statutes which are unclear and are susceptible to construction by a state court which might prevent the need for consideration of the constitutional issues. *Bellotti v. Baird*, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976); *Harris County Commissioners' Court v. Moore*, 420 U.S. 77, 95 S.Ct. 870, 43 L.Ed.2d 32 (1975).

However, despite the presence of such factors, this Court finds that the District Court properly reached the merits of the case. When the action was initiated, time was of the essence. Indeed, the District Court rendered its opinion less than 90 days before the election. The political candidates, as well as the state, required a speedy resolution of the matter; they had to know whether or not the candidates were to participate in the election and any delay would have adversely affected all involved. The state had to prepare the ballots, while the candidates needed time to espouse their

---

* The Honorable Richard A. Enslen, United States District Court Judge for the Western District of Michigan, sitting by designation.

1. Because the District Court permitted Greaves to collect signatures up until 55 days before the general election, his name did appear on the ballot for the presidential election.

views and get their campaigns into full swing. Furthermore, it appeared to the District Court that some of the issues raised, such as the signature requirement, would undoubtedly call for a constitutional decision.

Because of the importance of the issues involved, and the lack of time, the District Court cannot be faulted for having reached the merits of the action. See *Kay v. Austin*, 621 F.2d 809 (CA 6 1980). The District Court acted properly in not abstaining from resolving the issues of statutory interpretation.

### Filing Deadline

The Kentucky statute mandating deadlines for filing of certificates and petitions of nomination for statewide races provides:

(1) Certificates of nomination issued by the state board of elections shall be filed by that board with the secretary of state immediately. Such certificates issued by the county board of elections shall be filed by that board with the county clerk immediately.

(2) Certificates of nomination made by the governing authority of a party to fill vacancies in office, as provided in KRS 118.115, shall, when required to be filed with the secretary of state, be filed not less than fifty-five (55) days before the day fixed by law for the election of the person in nomination. When required to be filed with the county clerk, they shall be filed not less than fifty-five (55) days before the day fixed by law for the election of the person in nomination.

(3) Except as provided in subsection (4) of this section, petitions and certificates of nomination, when required to be filed with the secretary of state, shall be filed not less than fifty-five (55) days before the day fixed by law for the holding of primary elections. When required to be filed with the county clerk, they shall be filed not less than fifty-five (55) days before the day fixed by law for holding of primary elections.

(4) Petitions and certificates of nomination for the nomination of candidates for city offices or of candidates for members of boards of education shall be filed not less than fifty-five (55) days before the day fixed by law for the election of the person in nomination. Petitions and certificates of nomination for electors of President and Vice President of the United States shall be filed with the secretary of state not less than fifty-five (55) days prior to the date fixed by law for the election of such electors. (KRS 118.365)

Mills argues that (3) of the statute applies to independent candidates, and accordingly their petitions should have been filed 55 days before the *primary* election. She argues that this interpretation serves the state interest because independent candidates need more time to make their views known than major party candidates require. Early filing will also, Mills argues, demonstrate that an independent candidate does, in fact, have some modicum of support in the state.

Anderson and Greaves maintain that (4) of the statute is controlling, because (4) applies to all presidential candidates. Electors of presidents for independent candidates, as well as major parties candidates, are not required to file until 55 days before the *general* election.

Examination of the statute in question leads to the conclusion that Anderson, Greaves, and the District Court are correct in their statutory interpretation that (4) is controlling. The statute makes no distinction between independent and major party candidates, and (4) includes requirements for a nomination, and petitions. Had the legislature intended this section to apply only to the major parties it could have omitted the word "petition" from the statute. For this Court to ignore this significant word would mean that we are unwilling to give full measure to the statute.

While (3) says nothing about presidential electors, (4) specifically addresses itself to presidential electors. It is an elementary rule of statutory construction that the specific modifies and controls the general provisions of a statute. *Ginsberg & Son, Inc. v. Popkin*, 285 U.S. 204, 52 S.Ct. 322, 76

L.Ed. 704 (1932) cited in *Clifford MacEvoy Company v. United States*, 322 U.S. 102, 64 S.Ct. 890, 88 L.Ed. 1163 (1944). Consequently, there is no need to resort to the general language of (3), when (4) specifically applies to presidential primaries.

## Sore Loser Provision

The so called "sore loser" section of the Kentucky statute provides:

(1) No candidate who has been defeated for the nomination for any office in a primary election shall have his name placed on voting machines in the succeeding regular election as a candidate for the same office of the nomination to which he was a candidate in the primary election, except that if a vacancy occurs in the party nomination for which he was a candidate in the primary election his name may be placed on voting machines for the regular election as a candidate of that party if he has been duly made such party nominee after the vacancy occurs as provided in KRS 118.105.

(2) No person who was a candidate for nomination for any office in a primary election and who, before the succeeding regular election, is declared by the judgment of any court of competent jurisdiction to have violated, in the primary election, any provision of KRS Chapter 121, or to be responsible for such violation by others, shall have his name placed on voting machines for any office to be voted for in the succeeding regular election. (KRS 118.345)

Mills urges that this statute applies to presidential candidates, and that since Mr. Anderson had been unsuccessful in his attempt to gain the Republican nomination, he should not have had his name placed on the general election ballot. Anderson urges us to adopt the position of the District Court and find that the "sore loser" provision does not apply to presidential candidates.

■ The "sore loser" section of the Kentucky legislation applies only to candidates: " . . . who have been defeated for the nomination for any office in a 'primary elec-

tion' ". Since a candidate cannot lose his party's nomination for president by losing a state's primary election, it would appear that the "sore loser" statute is inapplicable, and does not address itself to presidential candidates.

The presidential preference primary is a recent development in the Kentucky electoral process. Indeed, the state legislature made provision for such a primary, for the first time, in 1974. The "sore loser" statute precedes the presidential preferential primary legislation by many years. Moreover, when the "sore loser" statute was amended in 1974, the legislature made no attempt to amend the statute to accommodate the newly enacted presidential primary election.

Our interpretation of the statute finds additional support from Mills, who has stipulated that the "sore loser" statute would not apply to the nominee of the Democratic or Republican parties. As a result of this stipulation, if either of these parties' candidates lost in the Kentucky presidential primary, but subsequently were nominated by his party, his name would appear on the ballot in Kentucky. Thus Mills, realizing the unjust result her interpretation would have on the presidential race, was willing to waive it for major party candidates.

Were we to accept the interpretation urged by Mills and follow it to its logical conclusion, it would seem to require that in future presidential elections, not only an independent candidate, but a nominee of one of the two major parties might not be permitted to appear on the general election ballot. The constitutionality of such an interpretation is subject to grave doubts. This untenable result, however, is not contemplated by the "sore loser" statute inasmuch as the Kentucky legislature, in its wisdom, has seen fit to limit the "sore loser" statute to those offices where a *nomination* is gained or lost through the primary process, not through a national convention.

## Signature and Desire to Vote Provision

Greaves challenges the constitutionality of KRS 118.315, which provides:

(1) A candidate for any office to be voted for at any regular election may be nominated by a petition of electors qualified to vote for him, complying with the provision of subsection (2) of this section. (2) A petition of nomination for a state officer, or any officer for whom all the electors of the state are entitled to vote, shall contain five thousand (5000) petitioners; for a representative in Congress from any congressional district, or for any officer from any other district, or for any officer from any other district except as herein provided, four hundred (400) petitioners; for a county officer or member of the general assembly, one hundred (100) petitioners; for a soil and water conservation district supervisor, twenty-five (25) petitioners; for an officer of a precinct or ward, or other division less than a county, except as herein provided, twenty (20) petitioners. The signatures of the petition need not be appended to one (1) paper. No petitioner shall be counted unless his residence and post-office address are designated. If any person joins in nominating, by petition, more than one (1) nominee for any office to be filled, he shall be counted as a petitioner for the candidate whose petition is filed first, except a petitioner for the nomination of candidates for soil and water conservation district supervisors may be counted for every petition to which his signature is affixed. The petition shall state the name and residence of each of the candidates, the name of the office for which he is running, the district, if applicable, from which he is running, that he is legally qualified to hold the office; and that the subscribers desire, and are legally qualified, to vote for the candidate. The petition shall designate a brief name or title of the party or principle that the candidate represents, together with any simple figure or device by which it is desired that he be designated on the voting machines.

(3) The state board of elections shall prescribe the forms for the petition.

Greaves' arguments are addressed to several requirements of the statute. Although these requirements should not be treated independently, for the purpose of clarity the Court will discuss them individually:

### 1. Signatures—Equal Protection

■ Greaves argues that requiring a candidate, who seeks placement on the general ballot for the presidential election via a petition, to obtain 5,000 signatures before he can appear on the *general* ballot violates the equal protection clause because a member of a political party, pursuant to KRS 118.125, may appear on his party's *primary* ballot once he has received the endorsement of two party members.[2]

... the candidate for nomination by the party at whose hands he seeks the nomination, shall have his name printed on the official ballot of his party for an office to which he is eligible in that primary, upon filing, with the proper officer at the proper time, a notification and declaration.

(2) The notification and declaration shall be in the form prescribed by the state board of elections. The declaration shall be subscribed and sworn to by the person making it, before an officer authorized to administer an oath.

(3) At the time of filing his notification and declaration the candidate shall file therewith an affidavit of two (2) reputable electors who are members of the party to which the candidate belongs. The affidavit shall be in the form prescribed by the state board of elections. (KRS 118.125)

---

**2.** Greaves touches upon this argument only tangentially in his brief, however, counsel did discuss it at some length during oral arguments.

It is also noted by the Court that Greaves, although challenging the number of signatures needed on the petition at the District Court level, raises no such objection in this appeal.

The 5,000 signatures required by KRS 118.315 represents less than one percent of the electors in the state (See District Court's Opinion). Reasonable signature requirements, such as this one have readily been accepted as constitutionally permissible. *Jenness, infra; Storer, supra.*

Taken literally, Greaves is comparing apples to oranges, and the comparison he makes does not fit into an equal protection analysis. Under KRS 118.315 a candidate must obtain 5,000 signatures to be placed on the *general* ballot, while a candidate in a political party needs only 2 signatures to be placed on the *primary* slate. Obviously, candidates in these two categories are not similarly situated; one is a candidate for general election, and the other seeks ballot placement for a primary election.

However, to treat the challenge made by Greaves in such a narrow manner would be unfair because he is urging a more sweeping indictment of Kentucky election laws. What he really challenges is a scheme which provides for more than one way to obtain a position on the Kentucky general election ballot. Greaves' claim is bottomed on the premise that it is unfair to require that a candidate in a primary election marshall only 2 signatures (permitting him, should he win the primary, to be placed on the general election ballot); while a candidate seeking a place on the ballot by petition, must obtain 5,000 signatures before finding a position on the general election ballot. *Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1970).

The Supreme Court taught, in *Jenness,* that more than one avenue exists for obtaining a position on the general ballot. In that case a person, under Georgia law, could have his name placed on the general election ballot either by gathering the signatures of 5 percent of the total electorate, or by winning the majority of votes in a party primary. The court found that these two avenues to the general ballot were not only acceptable, but indeed, desirable. Under such a scheme small struggling candidates/parties would not be put through the expense of conducting a primary election, but could still appear on the general election ballot.

Following the reasoning of *Jenness,* it cannot be said that Kentucky has invidiously discriminated against political candidates or groups in setting up its system. Rather, it has recognized the differences between established well-financed parties/candidates, and those candidates and parties who have no elaborate political network. Its format provides greater access to the political process than would a single route to the general election ballot.

Although a system may be fair in its broad outline, it may well be unfair in the way its specific provisions are set forth. Fortunately, the Kentucky statutes in question do not suffer from such a liability. All a candidate seeking placement via KRS 118.315 must do to have his name placed on the general ballot is obtain 5,000 signatures. A candidate seeking placement pursuant to KRS 118.125 must, not only obtain signatures to be placed on the primary ballot, but must also succeed in winning that party's nomination. Therefore, in practice, the major party candidate must win the approval of a great number of electors before appearing on the general election ballot.

The obvious legitimate goal of both these routes to the general election ballot is to ensure that a candidate has a modicum of popular support. While it is true that the two processes are different, it cannot be said that the route open to the candidate via petition is inherently more burdensome than that open to a party candidate. Indeed, it could be argued that the primary system is more burdensome than the petition system since, at least insofar as the major parties are concerned, many prospective candidates with 5,000 or more votes in a primary election will not find their names on the general election ballot. See *Board of Election Commissioners of Chicago v. Libertarian Party of Illinois*, 591 F.2d 22 (CA 7 1979). See *Lyons v. Davoren*, 402 F.2d 890 (CA 1 1968); *Cross Fong Eu*, 430 F.Supp. 1036 (DC Cal 1977).

By the scheme Kentucky has adopted, its petition signature provision actively enhances the opportunity for greater participation in this system. Therefore, Greaves' challenge is found wanting and we find no violation of the equal protection clause.

**2. Desire to Vote Provision**

Greaves also challenges the provision of KRS 118.315 which requires a signer's dec-

laration that "the subscribers desire . . . to vote for the candidate." Greaves argues that such a provision violates the secrecy of the ballot, and abridges a citizen's rights under the First and Fourteenth Amendments to the Constitution.

## A. Violation of the Right to a Secret Ballot

■ Although the US Constitution does not specifically guarantee that a person has a right to a secret ballot, such a right has been recognized as one of the fundamental civil liberties of our democracy. *Buckley v. Valeo,* 519 F.2d 821 (CA DC 1975) rev'd on other grounds 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed. 659 (1976); *US v. Executive Committee of Democratic Party of Greene County, Alabama,* 254 F.Supp. 543, 546 (ND Ala 1966). This principle takes on such significance because it safeguards the purity of our election process by eliminating the fear of scorn and ridicule, as well as lessening the evils of violence, intimidation, bribery and other corrupt practices which can be incumbent in non-secret elections. *Detroit v. Rush,* 82 Mich. 532, 46 N.W. 951 (1890). In order to protect the secrecy of the ballot, many states have enacted constitutional provisions dictating that all ballots must be cast under the cloak of complete privacy. Kentucky is a state which has done so, and Section 147 of its Constitution provides in part: ". . . All elections by the people shall be by secret official ballot."

Since it is clear that the right to a secret ballot is cherished in our political system, this Court must carefully scrutinize any claim that it is being abridged. If the "desire to vote" provision does seriously infringe upon such a right, it cannot survive.

Greaves believes that the challenged provision violates the right to a secret ballot because such a declaration is tantamount to being forced to reveal publicly in clear and uncertain terms, at least at the time of signing the petition, how a subscriber is going to vote in the election.

Mills argues that the provision is not violative of the secrecy the ballot guarantees, but is merely a public declaration which does not demand a mandatory revelation of the candidate for whom the subscriber will actually vote. Mills further argues that such a declaration is not binding upon the subscriber, and that since there is no enforcement provision to ensure the accuracy of such a declaration, harm cannot occur.

Although the Kentucky courts have not ruled on the relationship between the "desire to vote" provision and its constitutional mandate for a secret ballot, they have, on occasion, considered other practices, or laws, which violate the right to a secret ballot. In *Smith v. Jones,* 221 Ky. 546, 299 S.W. 170 (1927), the Kentucky Court of Appeals invalidated election results in a precinct because the election was conducted without a partition between voting places. The court said to do otherwise ". . . would be to give no force to the constitutional provision that all elections by the people shall be by secret official ballot". 299 S.W. at 171. The same court held that any ballot which was not of a certain thickness, and therefore could be seen through, must be invalidated since it violated the right to a secret ballot. *Nall v. Tinsley,* 107 Ky. 441, 54 S.W. 187 (1899). Clearly, these cases demonstrate Kentucky's concern with insuring that the integrity of secret ballots be maintained. *Harrison v. Stroud,* 129 Ky. 193, 110 S.W. 828 (1908); *Glenn v. Gnau,* 251 Ky. 3, 64 S.W.2d 168 (1933).

■ Of course, the "desire to vote" provision is not precisely analagous to the factual situations previously discussed. However, this provision, as did the lack of partitions and the thin ballots, results in publicizing the way one intends to vote. Certainly, it can be claimed that the latter two were actual revelations for whom the subscriber voted, while the former is only a declaration of one's desire and intention to vote in a future election. However, we refuse to adopt such an artificial distinction because all such practices jeopardize the right to secrecy of the ballot. The declaration operates to discourage citizens from participation in the electoral process simply because they do not wish people to know how they will vote. Such a revelation invokes the fears sought to be quelled by the

secrecy of voting laws in this country, and subjects an elector to the pressure of his neighbors, employers, and social peers. Since the declaration abridges the right to a secret ballot in such a direct and unacceptable manner, it cannot stand.

### B. Violation of the First and Fourteenth Amendments

Even if the Court were to find that the declaration was not an abridgement of the right to a secret ballot, we are convinced that the provision is impermissible because it imposes an unnecessary burden on voting and associational rights, in violation of the Equal Protection Clause. While it is true that the administration of the election process is a matter which has largely been entrusted to the states, the Supreme Court has made it clear that "the states may not infringe upon basic constitutional protections." *Kusper v. Pontikes,* 414 U.S. 51, 57, 94 S.Ct. 303, 307, 38 L.Ed.2d 260 (1973). The Supreme Court has long recognized that the freedom of association is protected by the First Amendment. *Communist Party of Indiana v. Whitcomb,* 414 U.S. 441, 94 S.Ct. 656, 38 L.Ed.2d 635 (1974); *United Mine Workers v. Illinois Bar Association,* 389 U.S. 217, 88 S.Ct. 853, 19 L.Ed.2d 426 (1967); *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 21 L.Ed.2d 1488 (1958). This right applies, not only to federal edicts, but also to State pronouncements. *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Similarly, the right to vote has always been recognized as one of our most salient rights: "Other rights, even the most basic; are illusory if the right to vote is undermined". *Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1963).

It is only those electors wishing to sign a petition who must declare their desire to vote for a specific individual. Electors who support other candidates have to make no such public declaration. The chilling effect that such a practice has on associational and voting rights is obvious. The voting citizen must decide whether to sign the petition, having his political preference clearly and unmistakably disclosed, or to refrain from signing. A potential subscriber, who is uncertain about whom he will support in the general election, but with an interest in the candidate, will be unable to sign the petition because of the requisite declaration. The impact to the candidate is equally drastic. He is unable to espouse his views because the declaration greatly curtails his ability to appear on the ballot and become widely known. The possibility of having new candidates with unusual and creative political philosophies is greatly reduced. As a result this requirement fosters a system which favors the status quo, while discouraging independent candidates and new political parties.

In light of those abridgements, the question is: does the state have a compelling reason for making the declaration a mandatory part of its electoral laws? This Court recognizes that some restrictions on the right to association, and even on voting, are unavoidable if the election system is not to grind to a halt. As the Supreme Court has stated:

> As a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos is to accompany the democratic processes. *Storer v. Brown,* 415 U.S. 724 at 731, 94 S.Ct. 1274, at 1279–80, 39 L.Ed.2d 714 (1974).

However, the State must demonstrate it has acted in this manner to serve some fundamental state interest. *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). Equally important, a state must make sure that the means it has chosen do not unnecessarily restrict constitutionally protected rights. *Dunn, supra.* If the state has open to it less drastic means to achieve its legitimate goal, then such means should be implemented. *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

According to Mills, the state interest in requiring the declaration is "some preliminary showing of a significant modicum of support" in order to avoid "confu-

sion, deception and even frustration of the democratic process at the general election." These are legitimate goals, for a state is properly concerned with assuring that its election system remains viable. *Jenness, supra.*

Indeed, the Supreme Court in the past has permitted state imposed restrictions to stand in view of these legitimate goals. *Jenness, supra; American Party of Texas v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974). The Court has placed its cachet on reasonable signature requirements as well as upon laws which restrict a subscriber to either voting in a primary or signing a nominating petition. *Jenness, supra; American Party, supra; Storer, supra.* It has found that these two methods are acceptable ways of demonstrating a "modicum of support" because they are unintrusive indicia of political expression.

However, the Supreme Court has never approved a declaration similar to the Kentucky "desire to vote" provision. In fact, part of the reason why the Supreme Court approved the Georgia election law in *Jenness* was because that law *did not* require petition signers to state that they intended to vote for the candidate in the general election. 403 U.S. at 439, 91 S.Ct. at 1974–75. This declaration, unlike the other two methods approved by the Supreme Court, compels an individual to state how he will vote in the general election. Such a provision may be the most effective means to determine the support a candidate has in the community, but it also greatly, and unnecessarily, curtails associational and voting rights.

Such an abridgement cannot stand. Kentucky has less burdensome alternatives available to carry out its legitimate goal. Those alternatives (signatures, restrictions on primary voting, etc.) strike the proper balance necessary in order to safeguard the voter's constitutional interests and to assure an effective election procedure. They are circumspect methods of protecting the election process and do not unnecessarily infringe upon constitutional rights.

Therefore, the judgment of the District Court is affirmed in part and reversed in part.