Mark **MILLER**, Mark Miller for Congress Committee, Oona Miller, and Peter R. Swendseid, Plaintiffs–Appellants,

v.

**LORAIN COUNTY BOARD OF ELECTIONS and Bob Taft, Ohio Secretary of State, Defendants–Appellees.**

No. 96–4267.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 3, 1997.

Decided April 2, 1998.

---

Joseph R. Compoli, Jr., Cleveland, OH, Mark N. Miller (argued and briefed), Greenbelt, MD, for Plaintiffs–Appellants.

M. Robert Flanagan (argued and briefed), Office of Prosecuting Attorney, Elyria, OH, for Defendant–Appellee Lorain County Bd. of Elections.

David M. Gormley (argued), Diane R. Richards (briefed), Office of Attorney General of Ohio, Columbus, OH, Catherine P. Palazzolo (briefed), Gallagher, Bradigan, Gams, Pryor & Littrell, Columbus, OH, for Defendant–Appellee Taft.

Before: WELLFORD, NORRIS, and SILER, Circuit Judges.

## OPINION

SILER, Circuit Judge.

Plaintiffs, Mark Miller, the Mark Miller for Congress Committee, Oona Miller, and Peter R. Swendseid (collectively "Miller"),[1] challenged the constitutionality of Ohio's ballot access scheme. Mark Miller was an independent candidate for United States Congress in 1994. The district court granted summary judgment in favor of the defendant, Lorain County Board of Elections ("Board"), and dismissed the case against Bob Taft, the Ohio Secretary of State. For the reasons stated below, we **AFFIRM**.

1. Two voters, Oona Miller and Peter R. Swendseid, are included as plaintiffs-appellants. Miller has included these individuals as the courts have recognized that ballot access restrictions implicate the rights of voters to cast a meaningful vote. *See Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 855–56, 31 L.Ed.2d 92 (1972).

2. Ohio Revised Code § 3513.05 states, in pertinent part:

Each person desiring to become a candidate for party nomination or for election to an office or position to be voted for at a primary election ... shall, not later than four p.m. of the seventy-fifth day before the day of the primary election, or if the primary election is a presidential primary election, not later that four p.m. of the sixtieth day before the day of the presidential primary election, file a declaration of candidacy and petition.... [I]f the declaration of candidacy is one that is to be submitted only to electors within a district ...

## I.

In Ohio there are two methods for obtaining access to the general election ballot for the United States Congress. In order to become a political party candidate for election to an office to be nominated through a primary election, a person is required to file a petition that contains at least fifty valid signatures of qualified electors of the political party of which the candidate is a member. Ohio Rev.Code § 3513.05.[2]

In order to become an independent candidate for election to an office for which the candidate may be nominated at a primary election, a person is required to file a nominating petition that contains valid signatures of at least one percent of qualified electors voting in the last gubernatorial election who reside within the district, political subdivision or portion thereof where the election is to be held. Ohio Rev.Code § 3513.257.[3]

In sum, after filing the required petition, a political party candidate must run in a primary election and win in order to have his or her name placed on the general election ballot. In contrast, an independent candidate, after gathering the required number of signatures for a nominating petition, is automatically placed on the general election ballot.

The petitions both for independents and for political party candidates require: (1) signatures by registered voters who reside within the district, political subdivision or

the petition shall be signed by not less than fifty qualified electors who are members of the same political party as the political party of which the candidate is a member.

3. Ohio Revised Code § 3513.257 states, in pertinent part:

Each person desiring to become an independent candidate for an office for which the candidates may be nominated at a primary election ... shall file ... a statement of candidacy and nominating petition.... The nominating petition shall contain signatures of qualified electors in the district ... in an amount to be determined as follows: ... (C) If the candidacy is to be voted on by the electors in any district ... in which five thousand or more electors voted for the office of governor at the next preceding election for that office, the nominating petition shall contain a number of signatures equal to at least one per cent of those electors.

portion thereof in which the election is to be held; (2) addresses that correspond with nominator's addresses on the voter registration cards that are filed with the county boards of elections; (3) genuine signatures; (4) legible signatures; (5) signatures in ink; and (6) a date. Ohio Rev.Code §§ 3501.11, 3501.38, 3513.261, 3513.262, 3513.263.

Miller decided to run for the United States Congress in the Thirteenth Congressional District of Ohio in 1994. As an independent candidate, he was required to gather signatures of one percent of the qualified electors from the district who voted in the 1990 gubernatorial election. In 1990, 163,000 voters within the Thirteenth District voted in the gubernatorial election. However, after 1990, the Thirteenth District was redistricted. It was determined, by extrapolation, that approximately 180,640 voters residing within the district would have voted in the 1990 gubernatorial election. Therefore, Miller was required to obtain 1,807 signatures from qualified voters in the Thirteenth District in order to have his name placed on the general ballot.[4]

On May 2, 1994, Miller filed a timely statement of candidacy accompanied by a nominating petition containing 1,950 signatures supporting his nomination as an independent candidate for the November 8, 1994, election. The Board sent Miller a letter dated July 12, 1994, which informed him that his petition had been disqualified because it contained insufficient signatures.[5] Miller sent the Board a letter dated August 1, 1994, asking it to reconsider and reverse its decision. On August 18, 1994, the Board held a meeting at which Miller challenged his disqualification. After hearing Miller's arguments on the matter, the Board voted to reaffirm Miller's disqualification. It then sent Miller a draft copy of the minutes of the meeting. Miller replied by a letter dated September 12, 1994, notifying the Board that he continued to disagree with their decision, that he requested a re-check of the disqualified signatures, and that he was contemplating equitable relief.[6]

Miller then filed suit in the Northern District of Ohio requesting a temporary restraining order ("TRO") and a preliminary injunction. He claimed that the signature requirement violated the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, as well as other various constitutional provisions, and that he was not given sufficient due process during the Board meeting to challenge his disqualification. Miller's request for the TRO and injunction were denied. The Board then moved for summary judgment, and Taft moved for a dismissal. Miller opposed these motions, and filed a Rule 56(f) motion requesting additional time for discovery. The magistrate judge issued his Report and Recommendation on September 8, 1995, recommending, *inter alia*, that summary judgment be granted in favor of the Board and a dismissal granted for Taft on Miller's challenges to the aforementioned Ohio candidacy statutes, but recommended denial of summary judgment with regard to Miller's Due Process claim.

After objections by both sides, the district court granted summary judgment in favor of the Board and dismissed Taft.

---

**4.** Miller also ran as an independent for the seat from the Thirteenth District in 1992. He filed nominating petitions that contained the necessary signatures and was placed on the general ballot.

**5.** The breakdown of the Board's decision to disqualify Miller's petition is as follows:

| REASON | NUMBER |
|---|---|
| Unregistered voters | 271 |
| Untransferred addresses | 63 |
| Signatures not genuine | 27 |
| No addresses on petitions | 7 |
| Incorrect addresses | 6 |
| Petitions signed in pencil | 4 |
| Electors not residing within 13th District | 3 |
| Signatures not legible | 2 |
| Petitions undated | 2 |
| Miscellaneous | 1 |
| TOTAL INVALID SIGNATURES | 386 |

| | |
|---|---|
| Total Signatures Submitted | 1,950 |
| Total Invalid Signatures | −386 |
| TOTAL VALID SIGNATURES | 1,564 |

**6.** In 1994, two independent candidates, John Michael Ryan and Howard Mason, obtained the requisite signatures, and were placed on the general ballot for the Thirteenth District.

## II.

### A.

■ This court reviews the district court's grant of summary judgment *de novo*. *Hartleip v. McNeilab, Inc.*, 83 F.3d 767, 774 (6th Cir.1996) (citing *E.E.O.C. v. University of Detroit*, 904 F.2d 331, 334 (6th Cir.1990)). Pursuant to Federal Rule of Civil Procedure 56, summary judgment shall be rendered when requested if the evidence presented in the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In assessing the merits of the motion, this court shall draw all justifiable inferences from the evidence presented in the record in the light most favorable to the non-moving party. *Woythal v. Tex–Tenn Corp.*, 112 F.3d 243, 245 (6th Cir.1997). However, an opponent to a motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but must set forth through competent and material evidence specific facts showing that there is a genuine issue for trial. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### B.

■ Miller claims that Ohio's statutory scheme for placing an independent candidate's name on the general election ballot violates the First Amendment's guarantees of freedom of speech and association, as well as equal protection under the laws as guaranteed by the Fourteenth Amendment. He argues that, according to *Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1982):

[A] court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It must then identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by the rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.

While Miller is correct that this is the appropriate analysis to be used by courts in assessing a challenge such as his, he has failed to present sufficient evidence that the burden imposed by the state, i.e., an increased signature requirement for independent candidates, is not justified by legitimate state interests.

The Supreme Court was faced with a constitutional challenge to a similar statutory scheme in *Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971). It described the plaintiffs' attack on the Georgia statutes as follows: [7]

In this litigation the appellants have mounted their attack upon Georgia's nominating-petition requirement on two different but related constitutional fronts. First, they say that to require a nonparty candidate to secure the signatures of a certain number of voters before his name may be printed on the ballot is to abridge

---

7. The Court described the provisions of the relevant statutes:

Any political organization whose candidate received 20% or more of the vote at the most recent gubernatorial or presidential election is a "political party." Any other political organization is a "political body." "Political parties" conduct primary elections, regulated in detail by state law, and only the name of the candidate for each office who wins the primary election is printed on the ballot at the subsequent general election, as his party's nominee

for the office in question. A nominee of a "political body" or an independent candidate, on the other hand, may have his name printed on the ballot at the general election by filing a nominating petition. This petition must be signed by a "number of electors of not less than five per cent of the total number of electors eligible to vote in the last election for the filling of the office the candidate is seeking."

*Jenness*, 403 U.S. at 433, 91 S.Ct. at 1971–72 (citations omitted).

the freedoms of speech and association guaranteed to that candidate and his supporters by the First and Fourteenth Amendments. Secondly, they say that when Georgia requires a nonparty candidate to secure the signatures of 5% of the voters before printing his name on the ballot, yet print the names of those who have won nomination in party primaries it violates the Fourteenth Amendment by denying the nonparty candidate the equal protection of the laws.

*Id.* at 434, 91 S.Ct. at 1972.

The Court analyzed the statutory scheme under the First and Fourteenth Amendments, concluding:

So far as the Georgia election laws are concerned independent candidates ... are wholly free to associate, to proselytize, to speak, to write, and to organize campaigns for any school of thought they wish. They may confine themselves to an appeal for write-in votes. Or they may seek, over a six months' period, the signatures of 5% of the eligible electorate for the office in question. If they choose the latter course, the way is open. For Georgia imposes no suffocating restrictions whatever upon the free circulation of nominating petitions.

*Id.* at 438–39, 91 S.Ct. at 1974.

It also noted that

a candidate for Governor in 1966, and a candidate for President in 1968, gained ballot designation by nominating petitions, and each went on to win a plurality of the votes cast at the general election. In a word, Georgia in no way freezes the political status quo, but implicitly recognizes the potential fluidity of American life.

*Id.* at 439, 91 S.Ct. at 1974–75.

The Court found the appellants' claim under the Equal Protection Clause of the Fourteenth Amendment equally unavailing. Noting that the Equal Protection argument was premised on the incorrect assumption that it is inherently more burdensome for a candidate to collect five percent of the total eligible electorate than to win a primary election, it held:

The fact is, of course, that from the point of view of one who aspires to elective public office in Georgia, alternative routes are available to getting his name printed on the ballot. He may enter the primary of a political party, or he may circulate nominating petitions either as an independent candidate or under the sponsorship of a political organization. We cannot see how Georgia has violated the Equal Protection Clause of the Fourteenth Amendment by making available these two alternative paths, neither of which can be assumed to be inherently more burdensome than the other.

*Id.* at 440–41, 91 S.Ct. at 1975.

In *Jenness,* the statutes contained a five percent signature requirement. Miller was faced with a one percent requirement, an obviously less burdensome task. This issue is therefore governed by the Court's holding in *Jenness* as a matter of law. Although Miller claims that *Celebrezze* contains a more stringent analysis than used by the Court in *Jenness,* the analysis is the same. *Celebrezze* offers more detail, but in no way changes the fundamentals of the test. However, given the importance of the issue presented, we shall proceed to consider Ohio's statutory scheme in light of the detailed analysis set forth in *Celebrezze.*

The first step requires us to consider the "character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments." *Celebrezze,* 460 U.S. at 789, 103 S.Ct. at 1570. The burdens imposed by the statutes are the signature requirement and the associated difficulties in obtaining such signatures.

The burdens imposed by a signature requirement have repeatedly been addressed. In *Rainbow Coalition of Oklahoma v. Oklahoma State Election Board,* 844 F.2d 740 (10th Cir.1988), the requirement that a political body seeking recognized status file petitions containing signatures of at least five percent of the total votes cast in the last general election was upheld. Furthermore, as previously mentioned, in *Jenness,* 403 U.S. at 440, 91 S.Ct. at 1975, Georgia's five percent signature requirement was upheld. Undoubtedly, Ohio's one percent requirement is not so burdensome as to render it unconstitutional. *See also Burdick v. Takushi,* 504

U.S. 428, 435 n. 3, 112 S.Ct. 2059, 2064 n. 3, 119 L.Ed.2d 245 (1992)("We have previously upheld party and candidate petition signature requirements that were as burdensome or more burdensome than Hawaii's one percent requirement.") (citations omitted).

We must then "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by the rule." *Celebrezze,* 460 U.S. at 789, 103 S.Ct. at 1570. The interests asserted by Ohio are as follows:

> Preservation of the integrity of the electoral process; regulating the number of candidates on the ballot to avoid undue voter confusion; establishment of a significant modicum of support; avoidance of deception which might frustrate the democratic process at the general election; encouragement of compromise and political stability; attempting to assure that the election winner will support a majority of the community; providing the electorate with an understandable ballot; prevention of interparty raiding of voters; maintaining interparty feuding to a minimum; and prevention of independent candidacies prompted by short range goals.

■ A state law requirement that a candidate make a preliminary showing of support is legitimate. *Celebrezze,* 460 U.S. at 788 n. 9, 103 S.Ct. at 1570 n. 9 ("The state has the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot, because it is both wasteful and confusing to encumber the ballot with the names of frivolous candidates"); *see also Jenness,* 403 U.S. at 431, 91 S.Ct. at 1970. Therefore, the interests asserted by Ohio are legitimate. This analysis leads us to the conclusion that Ohio's statutory scheme is not so burdensome on potential independent candidates as to render it unconstitutional.

■ As for the separate but interrelated Equal Protection argument, we have addressed a similar contention as it relates to Kentucky's requirement that a candidate obtain 5,000 signatures to be placed on the general presidential election ballot. *Anderson v. Mills,* 664 F.2d 600 (6th Cir. 1981). Miller's argument is that to require independent candidates to gather signatures of one percent of the registered voters in the district to place his name on the general election ballot is more burdensome than the fifty signatures required of party candidates for a place on the primary election ballot. We determined that this type of comparison

> is comparing apples to oranges, and the comparison he makes does not fit into an equal protection analysis. Under K.R.S. 118.315 a candidate must obtain 5,000 signatures to be placed on the general ballot, while a candidate in a political party needs only 2 signatures to be placed on the primary slate. Obviously, candidates in these two categories are not similarly situated; one is a candidate for general election, and the other seeks ballot placement for a primary election. . . .

> The Supreme Court taught, in *Jenness,* that more than one avenue exists for obtaining a position on the general ballot. In that case a person, under Georgia law, could have his name placed on the general election ballot either by gathering the signatures of 5 per cent of the total electorate, or by winning the majority of votes in a party primary. The court found that these two avenues to the general ballot were not only acceptable, but indeed, desirable. Under such a scheme small struggling candidates/parties would not be put through the expense of conducting a primary election, but could still appear on the general election ballot.

> Following the reasoning of *Jenness,* it cannot be said that Kentucky has invidiously discriminated against political candidates or groups in setting up its system. Rather, it has recognized the differences between established well-financed parties/candidates, and those candidates and parties who have no elaborate political network. Its format provides greater access to the political process than would a single route to the general election ballot.

*Id.* at 607. Ohio's statutory scheme for providing access to the general election ballot is similar. It provides two avenues for a candidate to place his name on the general election ballot. He can either run in a primary election as a political party candidate after

obtaining fifty signatures from party supporters and win the primary election, or he may gather signatures of one percent of the voters in his district who voted in the last gubernatorial election. It cannot be said that the route open to an independent candidate through a petition is more burdensome than that open to a party candidate. *Id.*

Finally, Miller has included an argument that the district court erred in failing to consider an expert affidavit by Professor Silvo Lenart before issuing its Memorandum of Opinion and Order of October 28, 1996. Miller claims that, pursuant to his filing of a Rule 56(f) affidavit, the district court could not decide on the Board's motion for summary judgment without addressing his Rule 56(f) "objection" and the Lenart affidavit.

The Board filed its motion for summary judgment on October 12, 1994. Miller's counsel filed the Rule 56(f) affidavit on October 25, 1994, stating that he needed additional time to complete discovery. The magistrate judge issued his Report and Recommendation on September 8, 1995. Miller finally submitted Lenart's affidavit on October 4, 1996, two years after his counsel had filed the Rule 56(f) affidavit, and three weeks before the district court rendered its decision.

■ A district court is not required to consider a delinquently filed affidavit. Fed. R.Civ.P. 56(f)("Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance. . . ."). This court reviews the district court's treatment of an affidavit filed pursuant to Rule 56(f) for an abuse of discretion. An abuse of discretion occurs when this court has "a definite and firm conviction that the trial court committed a clear error of judgment." *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir.1989).

■ Miller's argument fails for two reasons. First, contrary to his assertions, the district court did consider the Lenart affidavit. In its opinion, the court referred to the affidavit; however, the court simply did not find that it raised a issue of material fact. Second, assuming, *arguendo*, that the district court did not consider the affidavit, it would not have abused its discretion in refusing to do so. Miller filed the Lenart affidavit two years after filing the Rule 56(f) affidavit. A district court generally does not abuse its discretion in refusing to consider unreasonably tardy affidavits. *See, e.g., Schaffer v. A.O. Smith Harvestore Products, Inc.* 74 F.3d 722, 732 (6th Cir.1996).

### C.

■ Miller next alleges that he was not given due process by the Board. Specifically, he claims that the Board should have had the burden of proving that the signatures it invalidated were, in fact, not valid. It is undisputed that there exists no statutory or administrative procedure for protesting a decision to disqualify a candidate from the general election ballot. However, as noted, the Board did schedule a time for Miller to come to a Board meeting and present evidence that the Board erred by invalidating the 386 signatures on Miller's nominating petition. Due process claims are to be handled in two steps: first, this court asks whether a liberty or property interest exists that has been interfered with by the state; second, it determines whether the procedures attendant upon that deprivation were constitutionally sufficient. *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 459, 109 S.Ct. 1904, 1907–08, 104 L.Ed.2d 506 (1989).

■ As for the first step, procedural due process requirements only apply to the deprivation of interests encompassed by the Fourteenth Amendment's protection of property and liberty. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). "An individual claiming a protected interest must have a legitimate claim of entitlement to it. Protected liberty interests 'may arise from two sources—the Due Process Clause itself and the laws of the States.' " *Thompson*, 490 U.S. at 460, 109 S.Ct. at 1908 (quoting *Hewitt v. Helms*, 459 U.S. 460, 466, 103 S.Ct. 864, 868–69, 74 L.Ed.2d 675 (1983)).

Ohio provides no statutory nor administrative appeal rights from the Board's refusal to certify his nominating petition. Nevertheless, a writ of mandamus or prohibition might be available, if Miller makes the proper showing of "fraud, corruption, abuse of discretion, or clear disregard of statutes or court determinations." *State ex rel. The Limited, Inc., v. Franklin Co. Bd. of Elec.*, 66 Ohio St.3d 524, 613 N.E.2d 634, 635 (1993). *See also State ex rel. Clinard v. Greene County Bd. of Elec.*, 51 Ohio St.3d 87, 554 N.E.2d 895, 896 (1996). Miller argues that "[f]airness requires procedural safeguards that protect the right to challenge the Board's determination." However, whether an individual has a constitutionally protected interest in becoming a candidate for public office is not clear.[8] In any event, we need not address this issue because Miller received sufficient process. Therefore, we will assume, for the purposes of opinion, that Miller was entitled to some form of process from the Board.

The next step is to determine whether the process given to Miller was constitutionally sufficient. *Thompson*, 490 U.S. at 459, 109 S.Ct. at 1907–08. Miller was informed in writing that his nominating petition was disqualified because it contained insufficient signatures. He then requested that the Board reconsider its decision, and outlined his reasons for challenging the Board's determination. He was later notified in writing of the hearing, where he was informed that he could be represented by counsel and could bring a court stenographer to take minutes. Miller attended the Board meeting and presented his challenges to the Board's determination. The Board voted at that time to uphold its decision to disqualify Miller's nominating petition. Had the Board abused its discretion in this regard, such as by arbitrarily rejecting a valid group of signatures, Miller could have sought a writ of mandamus in the state court system. *See The Limited, Inc.*, 613 N.E.2d at 635.

---

**8.** It is difficult to define the contours of the right of candidacy. Given the integral relationship between candidacy and voters' rights under the First Amendment, candidacy may involve some level of a protected property or liberty interest. *See Duke v. Massey*, 87 F.3d 1226, 1232 (11th

While the nature of the interest at stake dictates the amount of process due, notice and an opportunity to respond is generally what is required. *See Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985). Miller undoubtedly received sufficient process, regardless of whether he was entitled to it. Accordingly, the district court correctly granted summary judgment on this issue.

**AFFIRMED.**

Cir.1996)("[A candidate] also has a procedural due process right to have his petition to be placed on the ballot to be free from a committee's unfettered discretion in rendering a decision.") (citations and internal quotations omitted).